RUMMEL *v.* ESTELLE, CORRECTIONS DIRECTOR

No. 78-6386. Argued January 7, 1980—Decided March 18, 1980

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. STEWART, J., filed a concurring opinion, *post*, p. 285. POWELL, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 285.

*Scott J. Atlas,* by appointment of the Court, 442 U. S. 939, argued the cause for petitioner. With him on the briefs was *Charles Alan Wright.*

*Douglas M. Becker,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Ted L. Hartley,* Executive Assistant Attorney General, *Gilbert J. Pena,* Assistant Attorney General, and *W. Barton Boling.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner William James Rummel is presently serving a life sentence imposed by the State of Texas in 1973 under its "recidivist statute," formerly Art. 63 of its Penal Code, which provided that "[w]hoever shall have been three times convicted of a felony less than capital shall on such third conviction be imprisoned for life in the penitentiary." [1] On January

---

*Briefs of *amici curiae* urging affirmance were filed by *Keith W. Burris* for the Criminal District Attorney of Bexar County, Texas; and by *Michael Kuhn* for the District Attorney of Harris County, Texas.

[1] With minor revisions, this article has since been recodified as Texas Penal Code Ann. § 12.42 (d) (1974).

19, 1976, Rummel sought a writ of habeas corpus in the United States District Court for the Western District of Texas, arguing that life imprisonment was "grossly disproportionate" to the three felonies that formed the predicate for his sentence and that therefore the sentence violated the ban on cruel and unusual punishments of the Eighth and Fourteenth Amendments. The District Court and the United States Court of Appeals for the Fifth Circuit rejected Rummel's claim, finding no unconstitutional disproportionality. We granted certiorari, 441 U. S. 960, and now affirm.

## I

In 1964 the State of Texas charged Rummel with fraudulent use of a credit card to obtain $80 worth of goods or services.[2] Because the amount in question was greater than $50, the charged offense was a felony punishable by a minimum of 2 years and a maximum of 10 years in the Texas Department of Corrections.[3] Rummel eventually pleaded guilty to the charge and was sentenced to three years' confinement in a state penitentiary.

In 1969 the State of Texas charged Rummel with passing a forged check in the amount of $28.36, a crime punishable by imprisonment in a penitentiary for not less than two nor more

---

[2] In 1964 Texas Penal Code Ann., Art. 1555b, provided:

"Section 1. It shall be unlawful for any person to present a credit card or alleged credit card, with the intent to defraud, to obtain or attempt to obtain any item of value or service of any type; or to present such credit card or alleged credit card, with the intent to defraud, to pay for items of value or services rendered." App. to Tex. Penal Code Ann., p. 712 (1974).

[3] In 1964 Texas Penal Code Ann., Art. 1555b (4) (d), provided:

"For a violation of this Act, in the event the amount of the credit obtained or the value of the items or services is Fifty Dollars ($50) or more, punishment shall be confinement in the penitentiary for not less than two (2) nor more than ten (10) years." App. to Tex. Penal Code Ann., p. 713 (1974).

than five years.[4] Rummel pleaded guilty to this offense and was sentenced to four years' imprisonment.

In 1973 Rummel was charged with obtaining $120.75 by false pretenses.[5] Because the amount obtained was greater than $50, the charged offense was designated "felony theft," which, by itself, was punishable by confinement in a penitentiary for not less than 2 nor more than 10 years.[6] The prosecution chose, however, to proceed against Rummel under Texas' recidivist statute, and cited in the indictment his 1964 and 1969 convictions as requiring imposition of a life sentence if Rummel were convicted of the charged offense. A jury convicted Rummel of felony theft and also found as true the allegation that he had been convicted of two prior felonies. As a result, on April 26, 1973, the trial court imposed upon Rummel the life sentence mandated by Art. 63.

---

[4] In 1969 Texas Penal Code Ann., Art. 996, provided:

"If any person shall knowingly pass as true, or attempt to pass as true, any such forged instrument in writing as is mentioned and defined in the preceding articles of this chapter, he shall be confined in the penitentiary not less than two nor more than five years." App. to Tex. Penal Code Ann., p. 597 (1974).

[5] In 1973 Texas Penal Code Ann., Art. 1410, provided:

" 'Theft' is the fraudulent taking of corporeal personal property belonging to another from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." App. to Tex. Penal Code Ann., p. 688 (1974).

In 1973 Texas Penal Code Ann., Art. 1413, provided:

"The taking must be wrongful, so that if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft, but if the taking, though originally lawful, was obtained by false pretext, or with any intent to deprive the owner of the value thereof, and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete." App. to Tex. Penal Code Ann., p. 689 (1974).

[6] In 1973 Texas Penal Code § 1421 provided:

"Theft of property of the value of fifty dollars or over shall be punished by confinement in the penitentiary not less than two nor more than ten years." App. to Tex. Penal Code Ann., p. 690 (1974).

The Texas appellate courts rejected Rummel's direct appeal as well as his subsequent collateral attacks on his imprisonment.[7] Rummel then filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Texas. In that petition, he claimed, *inter alia,* that his life sentence was so disproportionate to the crimes he had committed as to constitute cruel and unusual punishment. The District Court rejected this claim, first noting that this Court had already rejected a constitutional attack upon Art. 63, see *Spencer* v. *Texas,* 385 U. S. 554 (1967), and then crediting an argument by respondent that Rummel's sentence could not be viewed as life imprisonment because he would be eligible for parole in approximately 12 years.

A divided panel of the Court of Appeals reversed. 568 F. 2d 1193 (CA5 1978). The majority relied upon this Court's decision in *Weems* v. *United States,* 217 U. S. 349 (1910), and a decision of the United States Court of Appeals for the Fourth Circuit, *Hart* v. *Coiner,* 483 F. 2d 136 (1973), cert. denied, 415 U. S. 983 (1974), in holding that Rummel's life sentence was "so grossly disproportionate" to his offenses as to constitute cruel and unusual punishment. 568 F. 2d, at 1200. The dissenting judge argued that "[n]o neutral principle of adjudication permits a federal court to hold that in a given situation individual crimes are too trivial in relation to the punishment imposed." *Id.,* at 1201–1202.

---

[7] Preliminarily, the respondent argues that Rummel's claim is barred by *Wainwright* v. *Sykes,* 433 U. S. 72 (1977), because he did not object at the punishment stage of his trial to the imposition of a mandatory life sentence. Respondent raised this claim for the first time in his petition to the Court of Appeals for rehearing en banc, which was filed shortly after *Wainwright* was decided. The Court of Appeals rejected this argument because it did not believe that Texas' contemporaneous-objection requirement extended to a challenge like that raised by Rummell. See 587 F. 2d 651, 653–654 (CA5 1978). Deferring to the Court of Appeals' interpretation of Texas law, we decline to hold that *Wainwright* bars Rummel from presenting his claim.

Rummel's case was reheard by the Court of Appeals sitting en banc. That court vacated the panel opinion and affirmed the District Court's denial of habeas corpus relief on Rummel's Eighth Amendment claim. 587 F. 2d 651 (CA5 1978). Of particular importance to the majority of the Court of Appeals en banc was the probability that Rummel would be eligible for parole within 12 years of his initial confinement. Six members of the Court of Appeals dissented, arguing that Rummel had no enforceable right to parole and that *Weems* and *Hart* compelled a finding that Rummel's life sentence was unconstitutional.

## II

Initially, we believe it important to set forth two propositions that Rummel does not contest. First, Rummel does not challenge the constitutionality of Texas' recidivist statute as a general proposition. In *Spencer* v. *Texas, supra,* this Court upheld the very statute employed here, noting in the course of its opinion that similar statutes had been sustained against contentions that they violated "constitutional strictures dealing with double jeopardy, *ex post facto* laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities." 385 U. S., at 560. Here, Rummel attacks only the result of applying this concededly valid statute to the facts of his case.

Second, Rummel does not challenge Texas' authority to punish each of his offenses as felonies, that is, by imprisoning him in a state penitentiary.[8] Cf. *Robinson* v. *California,* 370 U. S. 660 (1962) (statute making it a crime to be addicted to the use of narcotics violates the Eighth and Fourteenth Amendments). See also *Ingraham* v. *Wright,* 430 U. S. 651,

---

[8] Texas, like most States, defines felonies as offenses that "may—not must—be punishable by death or by confinement in the penitentiary. . . ." Tex. Penal Code Ann., Art. 47 (Vernon 1925), recodified without substantive change at Tex. Penal Code Ann. § 1.07 (14) (1974). See also W. LaFave & A. Scott, Handbook on Criminal Law 26 (1972).

667 (1977) (Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such . . ."). Under Texas law Rummel concededly could have received sentences totaling 25 years in prison for what he refers to as his "petty property offenses." Indeed, when Rummel obtained $120.75 by false pretenses he committed a crime punishable as a felony in at least 35 States and the District of Columbia.[9] Similarly, a large number of States authorized

---

[9] See Ala. Code §§ 13-3-50, 13-3-90 (1975) (1 to 10 years); Alaska Stat. Ann. § 11.20.360 (1970) (1 to 5 years); Ariz. Rev. Stat. Ann. §§ 13-661 (A)(3), 13-663 (A)(1), 13-671 (1956 and Supp. 1957-1978) (1 to 10 years); Ark. Stat. Ann. §§ 41-1901, 41-3907 (1964) (1 to 21 years); Colo. Rev. Stat. §§ 18-4-401, 18-1-105 (1973) (fine or up to 10 years); Del. Code Ann., Tit. 11, §§ 841, 843, 4205 (1974) (fine or up to 7 years); D. C. Code § 22-1301 (1973) (1 to 3 years); Fla. Stat. § 811.021 (1965) (fine or up to 5 years); Ga. Code Ann. §§ 26-1803, 26-1812 (1977) (fine or up to 10 years); Ind. Code Ann. §§ 10-3030 (b), 10-3039 (3) (Supp. 1975) (fine or up to 10 years); Kan. Stat. Ann. §§ 21-3701, 21-4501 (1974) (1 to 3 years); Ky. Rev. Stat. §§ 514.040, 532.080 (1975) (1 to 5 years); La. Rev. Stat. Ann. § 14:67 (West 1974) (up to 2 years); Me. Rev. Stat. Ann., Tit. 17, § 1601 (1965) (fine or up to 7 years); Md. Ann. Code, Art. 27, § 140 (1957) (fine or up to 10 years); Mass. Gen. Laws Ann., ch. 266, § 30 (West 1970) (fine or up to 5 years); Mich. Comp. Laws § 750.218 (1968) (fine or up to 10 years); Minn. Stat. § 609.52 (Supp. 1978) (fine or up to 5 years); Miss. Code Ann. § 97-19-39 (1972) (fine or up to 3 years); Mont. Rev. Code Ann. §§ 94-2701 (1), 94-2704 (1), 94-2706 (1947) (1 to 14 years); Nev. Rev. Stat. §§ 205.380, 205.380 (1) (1977) (fine or 1 to 10 years); N. H. Rev. Stat. Ann. §§ 637:4 (I), 637:11 (II)(a), 651:2 (1974) (fine or up to 7 years); N. C. Gen. Stat. § 14-100 (1969) (fine or 4 months to 10 years); N. D. Cent. Code §§ 12.1-23-02, 12.1-23-05 (2)(a), 12.1-32-01 (3) (1976) (fine or up to 5 years); Ohio Rev. Code Ann. § 2911.01 (Supp. 1974) (1 to 3 years), committee comment following Ohio Rev. Stat. Ann. § 2913.02 (1975); Okla. Stat., Tit. 21, §§ 1541.1, 1541.2 (Supp. 1979-1980) (fine or 1 to 10 years); S. D. Comp. Laws Ann. §§ 22-37-1, 22-37-2, 22-37-3 (1969) (up to 10 years); Tenn. Code Ann. §§ 39-1901, 39-4203, 39-4204 (1975) (3 to 10 years); Tex. Penal Code Ann., Arts. 1410, 1413, 1421 (Vernon 1925) (2 to 10 years); Utah Code Ann. §§ 76-3-203 (3), 76-6-405, 76-6-412 (1978), and accompanying Compiler's Note (up to 5 years); Vt. Stat. Ann., Tit. 13, § 2002

significant terms of imprisonment for each of Rummel's other offenses at the times he committed them.[10] Rummel's challenge thus focuses only on the State's authority to impose a

(1958) (up to 10 years); Va. Code §§ 18.2–178, 18.2–95 (1975) (fine or 1 to 20 years); Wash. Rev. Code Ann. §§ 9.54.010 (2), 9.54.090 (6) (1974) (up to 15 years); W. Va. Code §§ 61–3–24, 61–3–13 (1977) (1 to 10 years); Wis. Stat. Ann. § 943.20 (1958) (fine or up to 5 years); Wyo. Stat. § 6–3–106 (1977) (up to 10 years).

[10] In 1969, Rummel's passing of a forged check would have been punishable by imprisonment in 49 States and the District of Columbia, even though the amount in question was only $28.36. See Ala. Code, Tit. 14, §§ 199, 207 (1958) (1 to 20 years); Ariz. Rev. Stat. Ann. § 13–421 (Supp. 1957–1978) (1 to 14 years); Ark. Stat. Ann. § 41–1806 (1964) (2 to 10 years); Cal. Penal Code Ann. §§ 470, 473 (West 1970) (up to 14 years); Colo. Rev. Stat. § 40–6–1 (1963) (1 to 14 years); Conn. Gen. Stat. § 53–346 (1968) (up to 5 years); Del. Code Ann., Tit. 11, §§ 861, 4205 (1974) (fine or up to 7 years); D. C. Code § 22–1401 (1973) (1 to 10 years); Fla. Stat. §§ 831.01, 831.02 (1965) (fine or up to 10 years); Ga. Code Ann. § 26–1701 (1977) (1 to 10 years); Haw. Rev. Stat. §§ 743–9, 743–11 (1968) (fine or up to 5 years' hard labor); Idaho Code §§ 18–3601, 18–3604 (1948) (1 to 14 years); Ill. Rev. Stat., ch. 38, § 17–3 (1971) (fine and/or 1 to 14 years); Ind. Code § 10–2102 (1956) (2 to 14 years plus fine); Iowa Code § 718.2 (1950) (fine or up to 10 years); Kan. Stat. Ann. §§ 21–609, 21–631 (1964) (up to 10 years' hard labor); Ky. Rev. Stat. § 434.130 (1962) (2 to 10 years); La. Rev. Stat. Ann. § 14:72 (West 1974) (fine or up to 10 years' hard labor); Me. Rev. Stat. Ann., Tit. 17, § 1501 (1965) (up to 10 years); Md. Ann. Code, Art. 27, § 44 (1957) (1 to 10 years); Mass. Gen. Laws Ann., ch. 267, § 5 (West 1970) (2 to 10 years); Mich. Comp. Laws § 750.253 (1968) (fine or up to 5 years); Minn. Stat. § 609.625 (3) (1964) (fine or up to 10 years); Miss. Code Ann. §§ 2172, 2187 (1942) (2 to 15 years); Mo. Rev. Stat. § 561.011 (1969) (fine or up to 10 years); Mont. Rev. Code Ann. §§ 94–2001, 94–2044 (1947) (1 to 14 years); Neb. Rev. Stat. § 28–601 (1943) (1 to 20 years plus fine); Nev. Rev. Stat. § 205.090 (1959) (1 to 14 years); N. H. Rev. Stat. Ann. §§ 581:1, 581:2 (1955) (up to 7 years); N. J. Stat. Ann. §§ 2A:109–1, 2A:85–6 (West 1969) (fine or up to 7 years); N. M. Stat. Ann. §§ 40A–16–9, 40A–29–3 (C) (Supp. 1963) (fine or 2 to 10 years); N. Y. Penal Law §§ 70.00 (2) (d), 170.10, 170.25 (McKinney 1967 and 1975) (up to 7 years); N. C. Gen. Stat. § 14–120 (1969) (4 months to 10 years); N. D. Cent. Code §§ 12–39–23, 12–39–27 (1960) (up to 10

sentence of life imprisonment, as opposed to a substantial term of years, for his third felony.

This Court has on occasion stated that the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime. See, e. g., *Weems* v.

years); Ohio Rev. Code Ann. § 2913.01 (1954) (1 to 20 years); Okla. Stat., Tit. 21, §§ 1577, 1621 (2) (1958) (up to 7 years); Ore. Rev. Stat. §§ 165.105, 165.115 (Supp. 1967) (up to 10 years); Pa. Stat. Ann., Tit. 18, § 5014 (Purdon 1963) (fine or up to 10 years); R. I. Gen. Laws § 11–17–1 (1956) (fine or up to 10 years); S. C. Code § 16–13–10 (1976) (1 to 7 years plus fine); S. D. Comp. Laws Ann. §§ 22–39–14, 22–39–17 (1967) (fine or up to 5 years); Tenn. Code Ann. §§ 39–1704, 39–1721, 39–4203, 39–4204 (1955 and Supp. 1974) (1 to 5 years); Tex. Penal Code Ann., Art. 996 (Vernon 1925) (2 to 5 years); Utah Code Ann. §§ 76–26–1, 76–26–4. (1953) (1 to 20 years); Vt. Stat. Ann., Tit. 13, § 1802 (1958) (fine or up to 10 years); Va. Code § 18.1–96 (1960) (up to 10 years); Wash. Rev. Code Ann. §§ 9.44.020, 9.44.060 (1956) (up to 20 years); W. Va. Code § 61–4–5 (1966) (up to 10 years); Wis. Stat. Ann. § 943.38 (1958) (fine or up to 10 years); Wyo. Stat. § 6–2–101 (1977) (up to 14 years).

In 1964, at least five of the States that had specific statutes covering credit-card fraud authorized terms of imprisonment for a crime like Rummel's. See Cal. Penal Code Ann. § 484a (b) (6) (Deering Supp. 1964), § 18 (Deering 1960) (up to 5 years); Kan. Stat. Ann. §§ 21–533, 21–534, 21–590 (1964) (up to 5 years' hard labor); 1963 Ore. Laws, ch. 588, § 3 (6) (up to 5 years); Tex. Penal Code Ann., Art. 1555b (Vernon Supp. 1973) (2 to 10 years); Va. Code § 18.1–119.1 (Supp. 1964) (up to 10 years). A number of other States, while lacking specific statutes dealing with credit-card fraud, apparently authorized an equivalent degree of punishment for such a crime under their general fraud provisions. See, e. g., Ala. Code, Tit. 14, §§ 209, 331 (1958 and Supp. 1973) (1 to 10 years); Mont. Rev. Code Ann. §§ 94–1805, 94–2704 (1), 94–2706 (1947) (1 to 14 years); N. H. Rev. Stat. Ann. § 580:1 (1955) (fine or up to 7 years); N. C. Gen. Stat. § 14–100 (1953) (fine or up to 10 years); N. D. Cent. Code § 12–38–04 (1960) (fine or up to 3 years); Tenn. Code Ann. §§ 39–1901, 39–4203, 39–4204 (1955 and Supp. 1974) (1 to 5 years); Vt. Stat. Ann., Tit. 13, § 2002 (1958) (fine or up to 10 years). After 1964, at least two other States adopted specific statutes dealing with credit-card fraud and authorizing imprisonment for crimes like Rummel's. See Idaho Code §§ 18–112, 18–3113, 18–3119 (1979) (fine or up to 5 years); Wash. Rev. Code Ann. § 9.26A.040 (1972) (up to 20 years).

*United States,* 217 U. S., at 367; *Ingraham* v. *Wright,* 430 U. S., at 667 (dictum); *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958) (plurality opinion). In recent years this proposition has appeared most frequently in opinions dealing with the death penalty. See, *e. g., Coker* v. *Georgia,* 433 U. S. 584, 592 (1977) (plurality opinion); *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.); *Furman* v. *Georgia,* 408 U. S. 238, 458 (1972) (POWELL, J., dissenting). Rummel cites these latter opinions dealing with capital punishment as compelling the conclusion that his sentence is disproportionate to his offenses. But as MR. JUSTICE STEWART noted in *Furman:*

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Id.,* at 306.

This theme, the unique nature of the death penalty for purposes of Eighth Amendment analysis, has been repeated time and time again in our opinions. See, *e. g., Furman* v. *Georgia, supra,* at 287, 289 (BRENNAN, J., concurring); *Gregg* v. *Georgia, supra,* at 187 (opinion of STEWART, POWELL, and STEVENS, JJ.); *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976); *Coker* v. *Georgia, supra,* at 598 (plurality opinion). Because a sentence of death differs in kind from any sentence of imprisonment, no matter how long, our decisions applying the prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality of the punishment meted out to Rummel.

Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare. In *Weems* v. *United States, supra,* a case coming to this Court from the Supreme Court of the Philippine

Islands, petitioner successfully attacked the imposition of a punishment known as *"cadena temporal"* for the crime of falsifying a public record. Although the Court in *Weems* invalidated the sentence after weighing "the mischief and the remedy," 217 U. S., at 379, its finding of disproportionality cannot be wrenched from the extreme facts of that case. As for the "mischief," Weems was convicted of falsifying a public document, a crime apparently complete upon the knowing entry of a single item of false information in a public record, "though there be no one injured, though there be no fraud or purpose of it, no gain or desire of it." *Id.*, at 365. The mandatory "remedy" for this offense was *cadena temporal,* a punishment described graphically by the Court:

> "Its minimum degree is confinement in a penal institution for twelve years and one day, a chain at the ankle and wrist of the offender, hard and painful labor, no assistance from friend or relative, no marital authority or parental rights or rights of property, no participation even in the family council. These parts of his penalty endure for the term of imprisonment. From other parts there is no intermission. His prison bars and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicil without giving notice to the 'authority immediately in charge of his surveillance,' and without permission in writing." *Id.*, at 366.

Although Rummel argues that the length of Weems' imprisonment was, by itself, a basis for the Court's decision, the Court's opinion does not support such a simple conclusion. The opinion consistently referred jointly to the length of imprisonment and its "accessories" or "accompaniments." See *id.*, at 366, 372, 377, 380. Indeed, the Court expressly rejected an argument made on behalf of the United States that "the pro-

vision for imprisonment in the Philippine Code is separable from the accessory punishment, and that the latter may be declared illegal, leaving the former to have application." According to the Court, "[t]he Philippine Code unites the penalties of *cadena temporal*, principal and accessory, and it is not in our power to separate them. . . ." *Id.*, at 382. Thus, we do not believe that *Weems* can be applied without regard to its peculiar facts: the triviality of the charged offense, the impressive length of the minimum term of imprisonment, and the extraordinary nature of the "accessories" included within the punishment of *cadena temporal*.

Given the unique nature of the punishments considered in *Weems* and in the death penalty cases, one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.[11] Only six years after *Weems*, for example, Mr. Justice Holmes wrote for a unanimous Court in brushing aside a proportionality challenge to concurrent sentences of five years' imprisonment and cumulative fines of $1,000 on each of seven counts of mail fraud. See *Badders* v. *United States*, 240 U. S. 391 (1916). According to the Court, there was simply "no ground for declaring the punishment unconstitutional." *Id.*, at 394.

Such reluctance to review legislatively mandated terms of imprisonment is implicit in our more recent decisions as well. As was noted by Mr. Justice White, writing for the plurality in *Coker* v. *Georgia, supra*, at 592, our Court's "Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible ex-

---

[11] This is not to say that a proportionality principle would not come into play in the extreme example mentioned by the dissent, *post*, at 288, if a legislature made overtime parking a felony punishable by life imprisonment.

tent." Since *Coker* involved the imposition of capital punishment for the rape of an adult female, this Court could draw a "bright line" between the punishment of death and the various other permutations and commutations of punishments short of that ultimate sanction. For the reasons stated by MR. JUSTICE STEWART in *Furman,* see *supra,* at 272, this line was considerably clearer than would be any constitutional distinction between one term of years and a shorter or longer term of years.

Similarly, in *Weems* the Court could differentiate in an objective fashion between the highly unusual *cadena temporal* and more traditional forms of imprisonment imposed under the Anglo-Saxon system. But a more extensive intrusion into the basic line-drawing process that is pre-eminently the province of the legislature when it makes an act criminal would be difficult to square with the view expressed in *Coker* that the Court's Eighth Amendment judgments should neither be nor appear to be merely the subjective views of individual Justices.

In an attempt to provide us with objective criteria against which we might measure the proportionality of his life sentence, Rummel points to certain characteristics of his offenses that allegedly render them "petty." He cites, for example, the absence of violence in his crimes. But the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal. A high official in a large corporation can commit undeniably serious crimes in the area of antitrust, bribery, or clean air or water standards without coming close to engaging in any "violent" or short-term "life-threatening" behavior. Additionally, Rummel cites the "small" amount of money taken in each of his crimes. But to recognize that the State of Texas could have imprisoned Rummel for life if he had stolen $5,000, $50,000, or $500,000, rather than the $120.75 that a jury convicted him of stealing, is virtually to concede that the lines to be drawn are indeed "subjective," and therefore properly within the province of

legislatures, not courts. Moreover, if Rummel had attempted to defraud his victim of $50,000, but had failed, no money whatsoever would have changed hands; yet Rummel would be no less blameworthy, only less skillful, than if he had succeeded.

In this case, however, we need not decide whether Texas could impose a life sentence upon Rummel merely for obtaining $120.75 by false pretenses. Had Rummel only committed that crime, under the law enacted by the Texas Legislature he could have been imprisoned for no more than 10 years. In fact, at the time that he obtained the $120.75 by false pretenses, he already had committed and had been imprisoned for two other felonies, crimes that Texas and other States felt were serious enough to warrant significant terms of imprisonment even in the absence of prior offenses. Thus the interest of the State of Texas here is not simply that of making criminal the unlawful acquisition of another person's property; it is in addition the interest, expressed in all recidivist statutes, in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law. By conceding the validity of recidivist statutes generally, Rummel himself concedes that the State of Texas, or any other State, has a valid interest in so dealing with that class of persons.

Nearly 70 years ago, and only 2 years after *Weems,* this Court rejected an Eighth Amendment claim that seems factually indistinguishable from that advanced by Rummel in the present case. In *Graham* v. *West Virginia,* 224 U. S. 616 (1912), this Court considered the case of an apparently incorrigible horsethief who was sentenced to life imprisonment under West Virginia's recidivist statute. In 1898 Graham had been convicted of stealing "one bay mare" valued at $50; in 1901 he had been convicted of "feloniously and burglariously" entering a stable in order to steal "one brown horse, named Harry, of the value of $100"; finally, in 1907 he was convicted of stealing "one red roan horse" valued at $75 and

various tack and accessories valued at $85.[12]  Upon conviction of this last crime, Graham received the life sentence mandated by West Virginia's recidivist statute.  This Court did not tarry long on Graham's Eighth Amendment claim,[13] noting only that it could not be maintained "that cruel and unusual punishment [had] been inflicted."  *Id.,* at 631.[14]

Undaunted by earlier cases like *Graham* and *Badders,* Rummel attempts to ground his proportionality attack on an alleged "nationwide" trend away from mandatory life sentences and toward "lighter, discretionary sentences."  Brief for Petitioner 43–44.  According to Rummel, "[n]o jurisdiction in the United States or the Free World punishes habitual offenders as harshly as Texas."  *Id.,* at 39.  In support of this proposition, Rummel offers detailed charts and tables documenting the history of recidivist statutes in the United States since 1776.

---

[12] See Transcript of Record in *Graham* v. *West Virginia,* O. T. 1911, No. 721, pp. 4, 5, 9.

[13] While at the time this Court decided *Graham* the Eighth Amendment's proscription against cruel and unusual punishments had not been held applicable to the States through the Fourteenth Amendment, see, *e. g., Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 462 (1947) (plurality opinion), earlier cases had assumed, without deciding, that the States could not inflict cruel and unusual punishments.  See, *e. g., Howard* v. *Fleming,* 191 U. S. 126, 135–136 (1903); *McDonald* v. *Massachusetts,* 180 U. S. 311, 313 (1901).  *Graham's* reference to *Howard, McDonald,* and other cases indicates that it followed a similar course.  See 224 U. S., at 631.

[14] Rummel characterizes *Graham* as a case where petitioner argued only that imposition of a life sentence under West Virginia's recidivist statute was, *per se,* a violation of the Eighth Amendment.  See Brief for Petitioner 18–19, n. 6.  We do not share that reading.  The brief submitted on Graham's behalf clearly attacked the alleged disproportionality of his sentence.  See Brief for Plaintiff in Error in *Graham* v. *West Virginia,* O. T. 1911, No. 721, pp. 37–38.  The brief on behalf of the State of West Virginia, moreover, expressly assumed that Graham was arguing that "the sentence in this case is so disproportionate to the offense as to be cruel and unusual."  Brief for Defendant in Error in *Graham* v. *West Virginia, supra,* at 19.

Before evaluating this evidence, we believe it important to examine the exact operation of Art. 63 as interpreted by the Texas courts. In order to qualify for a mandatory life sentence under that statute, Rummel had to satisfy a number of requirements. First, he had to be convicted of a felony and actually sentenced to prison.[15] Second, at some time subsequent to his first conviction, Rummel had to be convicted of another felony and again sentenced to imprisonment.[16] Finally, after having been sent to prison a second time, Rummel had to be convicted of a third felony. Thus, under Art. 63, a three-time felon receives a mandatory life sentence, with possibility of parole, only if commission and conviction of each succeeding felony followed conviction for the preceding one, and only if each prior conviction was followed by actual imprisonment. Given this necessary sequence, a recidivist must twice demonstrate that conviction and actual imprisonment do not deter him from returning to crime once he is released. One in Rummel's position has been both graphically informed of the consequences of lawlessness and given an opportunity to reform, all to no avail. Article 63 thus is nothing more than a societal decision that when such a person commits yet another felony, he should be subjected to the admittedly serious penalty of incarceration for life, subject only to the State's judgment as to whether to grant him parole.[17]

---

[15] Texas courts have interpreted the recidivist statute as requiring not merely that the defendant be convicted of two prior felonies, but also that he actually serve time in prison for each of those offenses. See *Cromeans* v. *State,* 160 Tex. Crim. 135, 138, 268 S. W. 2d 133, 135 (1954).

[16] As the statute has been interpreted, the State must prove that each succeeding conviction was subsequent to both the commission of and the conviction for the prior offense. See *Tyra* v. *State,* 534 S. W. 2d 695, 697–698 (Tex. Crim. App. 1976); *Rogers* v. *State,* 168 Tex. Crim. 306, 308, 325 S. W. 2d 697, 698 (1959).

[17] Thus, it is not true that, as the dissent claims, the Texas scheme subjects a person to life imprisonment "merely because he is a three-time felon." *Post,* at 299, n. 18. On the contrary, Art. 63 mandates such a

In comparing this recidivist program with those presently employed in other States, Rummel creates a complex hierarchy of statutes and places Texas' recidivist scheme alone on the top rung. This isolation is not entirely convincing. Both West Virginia and Washington, for example, impose mandatory life sentences upon the commission of a third felony.[18] Rummel would distinguish those States from Texas because the Supreme Court of Washington and the United States Court of Appeals for the Fourth Circuit, which includes West Virginia, have indicated a willingness to review the proportionality of such sentences under the Eighth Amendment. See *State* v. *Lee*, 87 Wash. 2d 932, 937, n. 4, 558 P. 2d 236, 240, n. 4 (1976) (dictum); *Hart* v. *Coiner*, 483 F. 2d 136 (CA4 1973). But this Court must ultimately decide the meaning of the Eighth Amendment. If we disagree with the decisions of the Supreme Court of Washington and the Court of Appeals for the Fourth Circuit on this point, Washington and West Virginia are for practical purposes indistinguishable from Texas. If we agree with those courts, then of course sentences imposed in Texas, as well as in Washington and West Virginia, are subject to a review for proportionality under the Eighth Amendment. But in either case, the legislative judgment as to punishment in Washington and West Virginia has been the same as that in Texas.

Rummel's charts and tables do appear to indicate that he might have received more lenient treatment in almost any State other than Texas, West Virginia, or Washington. The distinctions, however, are subtle rather than gross. A number of States impose a mandatory life sentence upon conviction of four felonies rather than three.[19] Other States require one

---

sentence only after shorter terms of actual imprisonment have proved ineffective.

[18] See Wash. Rev. Code § 9.92.090 (1976); W. Va. Code § 61–11–18 (1977).

[19] See, *e. g.*, Colo. Rev. Stat. § 16–13–101 (1973 and Supp. 1976); Nev.

or more of the felonies to be "violent" to support a life sentence.[20] Still other States leave the imposition of a life sentence after three felonies within the discretion of a judge or jury.[21] It is one thing for a court to compare those States that impose capital punishment for a specific offense with those States that do not. See *Coker* v. *Georgia,* 433 U. S., at 595–596. It is quite another thing for a court to attempt to evaluate the position of any particular recidivist scheme within Rummel's complex matrix.[22]

Nor do Rummel's extensive charts even begin to reflect the complexity of the comparison he asks this Court to make. Texas, we are told, has a relatively liberal policy of granting "good time" credits to its prisoners, a policy that historically has allowed a prisoner serving a life sentence to become eligible for parole in as little as 12 years. See Brief for Respondent 16–17. We agree with Rummel that his inability to enforce any "right" to parole precludes us from treating his life sentence as if it were equivalent to a sentence of 12 years. Nevertheless, because parole is "an established variation on imprisonment of convicted criminals," *Morrissey* v. *Brewer,* 408 U. S. 471, 477 (1972), a proper assessment of Texas'

---

Rev. Stat. § 207.010 (1977); S. D. Comp. Laws Ann. §§ 22–6–1, 22–7–8 (Supp. 1978); Wyo. Stat. § 6–1–110 (1977).

[20] See, *e. g.,* Miss. Code Ann. § 99–19–83 (Supp. 1979).

[21] See, *e. g.,* D. C. Code § 22–104a (1973); Idaho Code § 19–2514 (1979); Okla. Stat., Tit. 21, § 51 (Supp. 1979–1980).

[22] Nor do we have another sort of objective evidence found in *Coker.* After *Furman,* where the Court had declared unconstitutional the death penalty statutes of all of the States as then applied, a majority of the States had re-enacted the death penalty for killings, but had not done so for rape. In *Coker* the plurality found this fact of some importance. See 433 U. S., at 594–595. Here, if there was a watershed comparable to *Furman,* it was *Spencer* v. *Texas,* 385 U. S. 554 (1967), which confirmed, rather than undercut, the constitutionality of recidivist statutes. There thus has been no comparable occasion for contemporary expression of legislative or public opinion on the question of what sort of penalties should be applied to recidivists, or to those who have committed crimes against property.

treatment of Rummel could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life. If nothing else, the possibility of parole, however slim, serves to distinguish Rummel from a person sentenced under a recidivist statute like Mississippi's, which provides for a sentence of life without parole upon conviction of three felonies including at least one violent felony. See Miss. Code Ann. § 99–19–83 (Supp. 1979).

Another variable complicating the calculus is the role of prosecutorial discretion in any recidivist scheme. It is a matter of common knowledge that prosecutors often exercise their discretion in invoking recidivist statutes or in plea bargaining so as to screen out truly "petty" offenders who fall within the literal terms of such statutes. See *Oyler* v. *Boles,* 368 U. S. 448, 456 (1932) (upholding West Virginia's recidivist scheme over contention that it placed unconstitutional discretion in hands of prosecutor). Indeed, in the present case the State of Texas has asked this Court, in the event that we find Rummel's sentence unconstitutionally disproportionate, to remand the case to the sentencing court so that the State might introduce Rummel's entire criminal record. If, on a remand, the sentencing court were to discover that Rummel had been convicted of one or more felonies in addition to those pleaded in the original indictment, one reasonably might wonder whether that court could then sentence Rummel to life imprisonment even though his recidivist status based on only three felonies had been held to be a "cruel and unusual" punishment.

We offer these additional considerations not as inherent flaws in Rummel's suggested interjurisdictional analysis but as illustrations of the complexities confronting any court that would attempt such a comparison. Even were we to assume that the statute employed against Rummel was the most stringent found in the 50 States, that severity hardly would render Rummel's punishment "grossly disproportionate" to his offenses or to the punishment he would have received in the other States. As Mr. Justice Holmes noted in his dissenting

opinion in *Lochner* v. *New York,* 198 U. S. 45, 76 (1905), our Constitution "is made for people of fundamentally differing views. . . ." Until quite recently, Arizona punished as a felony the theft of any "neat or horned animal," regardless of its value;[23] California considers the theft of "avocados, olives, citrus or deciduous fruits, nuts and artichokes" particularly reprehensible.[24] In one State theft of $100 will earn the offender a fine or a short term in jail;[25] in another State it could earn him a sentence of 10 years' imprisonment.[26] Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State.[27]

---

[23] See Ariz. Rev. Stat. Ann. § 13–663 (A) (Supp. 1957–1978) (repealed in 1977).

[24] See Cal. Penal Code Ann. § 487 (1) (West 1970).

[25] See, *e. g.,* Idaho Code §§ 18–4604, 18–4607 (1979).

[26] See, *e. g.,* Nev. Rev. Stat. § 205.220 (1973).

[27] The dissent draws some support for its belief that Rummel's sentence is unconstitutional by comparing it with punishments imposed by Texas for crimes other than those committed by Rummel. Other crimes, of course, implicate other societal interests, making any such comparison inherently speculative. Embezzlement, dealing in "hard" drugs, and forgery, to name only three offenses, could be denominated "property related" offenses, and yet each can be viewed as an assault on a unique set of societal values as defined by the political process. The notions embodied in the dissent that if the crime involved "violence," see *post,* at 295–296, n. 12, a more severe penalty is warranted under objective standards simply will not wash, whether it be taken as a matter of morals, history, or law. Caesar's death at the hands of Brutus and his fellow conspirators was undoubtedly violent; the death of Hamlet's father at the hands of his brother, Claudius, by poison, was not. Yet there are few, if any, States which do not punish just as severely murder by poison (or attempted murder by poison) as they do murder or attempted murder by stabbing. The highly placed executive who embezzles huge sums from a state savings and loan association, causing many shareholders of limited means to lose substantial parts of their savings, has committed a crime very different from a man who takes a smaller amount of money from the same savings

Perhaps, as asserted in *Weems*, "time works changes" upon the Eighth Amendment, bringing into existence "new conditions and purposes." 217 U. S., at 373. We all, of course, would like to think that we are "moving down the road toward human decency." *Furman* v. *Georgia*, 408 U. S., at 410 (BLACKMUN, J., dissenting). Within the confines of this judicial proceeding, however, we have no way of knowing in which direction that road lies. Penologists themselves have been unable to agree whether sentences should be light or heavy,[28] discretionary or determinate.[29] This uncertainty

and loan at the point of a gun. Yet rational people could disagree as to which criminal merits harsher punishment. By the same token, a State cannot be required to treat persons who have committed three "minor" offenses less severely than persons who have committed one or two "more serious" offenses. If nothing else, the three-time offender's conduct supports inferences about his ability to conform with social norms that are quite different from possible inferences about first- or second-time offenders.

In short, the "seriousness" of an offense or a pattern of offenses in modern society is not a line, but a plane. Once the death penalty and other punishments different in kind from fine or imprisonment have been put to one side, there remains little in the way of objective standards for judging whether or not a life sentence imposed under a recidivist statute for several separate felony convictions not involving "violence" violates the cruel-and-unusual-punishment prohibition of the Eighth Amendment. As Mr. Justice Frankfurter noted for the Court in *Gore* v. *United States*, 357 U. S. 386, 393 (1958), "[w]hatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, . . . these are peculiarly questions of legislative policy."

[28] Compare A. Von Hirsch, Doing Justice: The Choice of Punishments, Report of the Committee for the Study of Incarceration 140 (1976); M. Yeager, Do Mandatory Prison Sentences for Handgun Offenders Curb Violent Crime?, Technical Report for the United States Conference of Mayors 25–26 (1976); with E. van den Haag, Punishing Criminals: Concerning a Very Old and Painful Question 158–159, 177 (1975). See generally F. Zimring & G. Hawkins, Deterrence: The Legal Threat in Crime Control 234–241, 245–246 (1973).

[29] Compare R. McKay, It's Time to Rehabilitate the Sentencing Process, An Occasional Paper—Aspen Institute for Humanistic Studies 4–5 (1977); Von Hirsch, *supra*, at 98–104; with R. Dawson, Sentencing: The Decision

reinforces our conviction that any "nationwide trend" toward lighter, discretionary sentences must find its source and its sustaining force in the legislatures, not in the federal courts.

### III

The most casual review of the various criminal justice systems now in force in the 50 States of the Union shows that the line dividing felony theft from petty larceny, a line usually based on the value of the property taken, varies markedly from one State to another. We believe that Texas is entitled to make its own judgment as to where such lines lie, subject only to those strictures of the Eighth Amendment that can be informed by objective factors. See *Coker* v. *Georgia*, 433 U. S., at 592. Moreover, given Rummel's record, Texas was not required to treat him in the same manner as it might treat him were this his first "petty property offense." Having twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.

The purpose of a recidivist statute such as that involved here is not to simplify the task of prosecutors, judges, or juries. Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes.

---

as to Type, Length, and Conditions of Sentence, Report of the American Bar Foundation's Survey of the Administration of Criminal Justice in the United States 381, 414 (1969); Yeager, *supra*, at 25–26. See generally U. S. Dept. of Justice, Determinate Sentencing: Reform or Regression?, Proceedings of the Special Conference on Determinate Sentencing, June 2–3, 1977.

Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.

We therefore hold that the mandatory life sentence imposed upon this petitioner does not constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments. The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART, concurring.

I am moved to repeat the substance of what I had to say on another occasion about the recidivist legislation of Texas:

> "If the Constitution gave me a roving commission to impose upon the criminal courts of Texas my own notions of enlightened policy, I would not join the Court's opinion. For it is clear to me that the recidivist procedures adopted in recent years by many other States . . . are far superior to those utilized [here]. But the question for decision is not whether we applaud or even whether we personally approve the procedures followed in [this case]. The question is whether those procedures fall below the minimum level the [Constitution] will tolerate. Upon that question I am constrained to join the opinion and judgment of the Court." *Spencer* v. *Texas,* 385 U. S. 554, 569 (concurring opinion).

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The question in this case is whether petitioner was subjected to cruel and unusual punishment in contravention of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment, when he received a mandatory life sentence upon his conviction for a third property-related

felony. Today, the Court holds that petitioner has not been punished unconstitutionally. I dissent.

I

The facts are simply stated. In 1964, petitioner was convicted for the felony of presenting a credit card with intent to defraud another of approximately $80. In 1969, he was convicted for the felony of passing a forged check with a face value of $28.36. In 1973, petitioner accepted payment in return for his promise to repair an air conditioner. The air conditioner was never repaired, and petitioner was indicted for the felony offense of obtaining $120.75 under false pretenses. He was also charged with being a habitual offender. The Texas habitual offender statute provides a mandatory life sentence for any person convicted of three felonies. See Tex. Penal Code Ann., Art. 63 (Vernon 1925), as amended and recodified, Tex. Penal Code Ann. § 12.42 (d) (1974). Petitioner was convicted of the third felony and, after the State proved the existence of the two earlier felony convictions, was sentenced to mandatory life imprisonment.

After exhausting state remedies, petitioner sought a writ of habeas corpus in the Federal District Court for the Western District of Texas. Petitioner contended that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment. Petitioner did not suggest that the method of punishment—life imprisonment—was constitutionally invalid. Rather, he argued that the punishment was unconstitutional because it was disproportionate to the severity of the three felonies. A panel of the Court of Appeals for the Fifth Circuit accepted petitioner's view, 568 F. 2d 1193 (1978), but the court en banc vacated that decision and affirmed the District Court's denial of the writ of habeas corpus. 587 F. 2d 651 (1979).

This Court today affirms the Fifth Circuit's decision. I dissent because I believe that (i) the penalty for a noncapital offense may be unconstitutionally disproportionate, (ii) the

possibility of parole should not be considered in assessing the nature of the punishment, (iii) a mandatory life sentence is grossly disproportionate as applied to petitioner, and (iv) the conclusion that this petitioner has suffered a violation of his Eighth Amendment rights is compatible with principles of judicial restraint and federalism.

## II

### A

The Eighth Amendment prohibits "cruel and unusual punishments." That language came from Art. I, § 9, of the Virginia Declaration of Rights, which provided that "excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The words of the Virginia Declaration were taken from the English Bill of Rights of 1689. See Granucci, "Nor Cruel and Unusual Punishments Inflicted": The Original Meaning, 57 Calif. L. Rev. 839, 840 (1969).

Although the legislative history of the Eighth Amendment is not extensive, we can be certain that the Framers intended to proscribe inhumane methods of punishment. See *Furman* v. *Georgia,* 408 U. S. 238, 319–322 (1972) (MARSHALL, J., concurring); Granucci, *supra,* at 839–842. When the Virginia delegates met to consider the Federal Constitution, for example, Patrick Henry specifically noted the absence of the provisions contained within the Virginia Declaration. Henry feared that without a "cruel and unusual punishments" clause, Congress "may introduce the practice . . . of torturing, to extort a confession of the crime." [1] Indeed, during debate in the First Congress on the adoption of the Bill of Rights, one Congressman objected to adoption of the Eighth Amendment precisely because "villains often deserve whipping, and perhaps having their ears cut off." [2]

---

[1] 3 J. Elliot, Debates on the Federal Constitution 447–448 (1876).

[2] 1 Annals of Cong. 754 (1789) (Rep. Livermore).

In two 19th-century cases, the Court considered constitutional challenges to forms of capital punishment. In *Wilkerson* v. *Utah,* 99 U. S. 130, 135 (1879), the Court held that death by shooting did not constitute cruel and unusual punishment. The Court emphasized, however, that torturous methods of execution, such as burning a live offender, would violate the Eighth Amendment. *In re Kemmler,* 136 U. S. 436 (1890), provided the Court with its second opportunity to review methods of carrying out a death penalty. That case involved a constitutional challenge to New York's use of electrocution. Although the Court did not apply the Eighth Amendment to state action, it did conclude that electrocution would not deprive the petitioner of due process of law. See also *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947).

## B

The scope of the Cruel and Unusual Punishments Clause extends not only to barbarous methods of punishment, but also to punishments that are grossly disproportionate. Disproportionality analysis measures the relationship between the nature and number of offenses committed and the severity of the punishment inflicted upon the offender. The inquiry focuses on whether a person deserves such punishment, not simply on whether punishment would serve a utilitarian goal. A statute that levied a mandatory life sentence for overtime parking might well deter vehicular lawlessness, but it would offend our felt sense of justice. The Court concedes today that the principle of disproportionality plays a role in the review of sentences imposing the death penalty, but suggests that the principle may be less applicable when a noncapital sentence is challenged. Such a limitation finds no support in the history of Eighth Amendment jurisprudence.

The principle of disproportionality is rooted deeply in English constitutional law. The Magna Carta of 1215 insured that "[a] free man shall not be [fined] for a trivial offence,

except in accordance with the degree of the offence; and for a serious offence he shall be [fined] according to its gravity."[3] By 1400, the English common law had embraced the principle, not always followed in practice, that punishment should not be excessive either in severity or length.[4] One commentator's survey of English law demonstrates that the "cruel and unusual punishments" clause of the English Bill of Rights of 1689 "was first, an objection to the imposition of punishments which were unauthorized by statute and outside the jurisdiction of the sentencing court, and second, a reiteration of the English policy against disproportionate penalties." Granucci, *supra*, at 860. See *Gregg* v. *Georgia*, 428 U. S. 153, 169 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.).

In *Weems* v. *United States*, 217 U. S. 349 (1910), a public official convicted for falsifying a public record claimed that he suffered cruel and unusual punishment when he was sentenced to serve 15 years' imprisonment in hard labor with chains.[5] The sentence also subjected Weems to loss of civil rights and perpetual surveillance after his release. This Court agreed that the punishment was cruel and unusual. The Court was attentive to the methods of the punishment, *id.*, at 363–364, but its conclusion did not rest solely upon the nature of punishment. The Court relied explicitly upon the

---

[3] J. Holt, Magna Carta 323 (1965).

[4] R. Perry, Sources of Our Liberties 236 (1959).

[5] The principle that grossly disproportionate sentences violate the Eighth Amendment was first enunciated in this Court by Mr. Justice Field in *O'Neil* v. *Vermont*, 144 U. S. 323 (1892). In that case, a defendant convicted of 307 offenses for selling alcoholic beverages in Vermont had been sentenced to more than 54 years in prison. The Court did not reach the question whether the sentence violated the Eighth Amendment because the issue had not been raised properly, and because the Eighth Amendment had yet to be applied against the States. *Id.*, at 331–332. But Mr. Justice Field dissented, asserting that the "cruel and unusual punishment" Clause was directed "against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged." *Id.*, at 339–340.

relationship between the crime committed and the punishment imposed:

> "Such penalties for such offenses amaze those who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." *Id.*, at 366–367.

In both capital and noncapital cases this Court has recognized that the decision in *Weems* v. *United States* "proscribes punishment grossly disproportionate to the severity of the crime." *Ingraham* v. *Wright*, 430 U. S. 651, 667 (1977); see *Hutto* v. *Finney*, 437 U. S. 678, 685 (1978); *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (opinion of WHITE, J.); *Gregg* v. *Georgia, supra,* at 171 (opinion of STEWART, POWELL, and STEVENS, JJ.); *Furman* v. *Georgia,* 408 U. S., at 325 (MARSHALL, J., concurring).[6]

In order to resolve the constitutional issue, the *Weems* Court measured the relationship between the punishment and the offense. The Court noted that Weems had been punished more severely than persons in the same jurisdiction who committed more serious crimes, or persons who committed a similar crime in other American jurisdictions. 217 U. S., at 381–382.[7]

---

[6] See also Jeffries & Stephan, Defenses, Presumptions, and Burden of Proof in the Criminal Law, 88 Yale L. J. 1325, 1377 (1979); Note, Disproportionality in Sentences of Imprisonment, 79 Colum. L. Rev. 1119 (1979).

[7] The Court notes that *Graham* v. *West Virginia,* 224 U. S. 616, 631 (1912), rejected an Eighth Amendment claim brought by a person sentenced under the West Virginia statute to mandatory life imprisonment for the commission of three felonies. But the *Graham* Court's entire discussion of that claim consists of one sentence: "Nor can it be maintained that cruel and unusual punishment has been inflicted." The Court then cited six cases in support of its statement. The first case was *In re Kemmler*, 136 U. S. 436, 448–449 (1890), in which the Court declined to apply the Eighth Amendment against state action. The *Graham* opinion also cited *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86, 111 (1909), in

*Robinson* v. *California,* 370 U. S. 660, 667 (1962), established that the Cruel and Unusual Punishments Clause applies to the States through the operation of the Fourteenth Amendment. The Court held that imprisonment for the crime of being a drug addict was cruel and unusual. The Court based its holding not upon the method of punishment, but on the nature of the "crime." Because drug addiction is an illness which may be contracted involuntarily, the Court said that "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Ibid.*

In *Furman* v. *Georgia, supra,* the Court held that the death penalty may constitute cruel and unusual punishment in some circumstances. The special relevance of *Furman* to this case lies in the general acceptance by Members of the Court of two basic principles. First, the Eighth Amendment prohibits grossly excessive punishment.[8] Second, the scope of

_____

which the Court recognized that no claim was made that the Eighth Amendment controlled state action, and stated that "[w]e can only interfere with such legislation and judicial action of the States enforcing it if the fines imposed are so grossly excessive as to amount to a deprivation of property without due process of law." The Eighth Amendment was not applied as a prohibition on state action until this Court's decision in *Robinson* v. *California,* 370 U. S. 660, 667 (1962). A one-sentence holding in a preincorporation decision is hardly relevant to the determination of the case before us today.

*Badders* v. *United States,* 240 U. S. 391 (1916), also adds "little to our knowledge of the scope of the cruel and unusual language." *Furman* v. *Georgia,* 408 U. S. 238, 325 (1972) (MARSHALL, J., concurring). In *Badders,* this Court rejected a claim that concurrent 5-year sentences and a $7,000 fine for seven counts of mail fraud violated the Eighth Amendment. 240 U. S., at 394. *Badders* merely teaches that the Court did not believe that a 5-year sentence for the commission of seven crimes was cruel and unusual.

[8] *Furman* v. *Georgia,* 408 U. S., at 280 (BRENNAN, J., concurring); *id.,* at 312 (WHITE, J., concurring); *id.,* at 331–332 (MARSHALL, J., con-

the Eighth Amendment is to be measured by "evolving standards of decency." See *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (opinion of Warren, C. J.).[9]

In *Coker* v. *Georgia, supra,* this Court held that rape of an adult woman may not be punished by the death penalty. The plurality opinion of MR. JUSTICE WHITE stated that a punishment is unconstitutionally excessive "if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." *Id.,* at 592.[10] The plurality concluded that the death penalty was a grossly disproportionate punishment for the crime of rape. The plurality recognized that "Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent." *Ibid.* To this end, the plurality examined the nature of the crime and attitudes of state legislatures and sentencing juries toward use of the death penalty in rape cases. In a separate opinion, I concurred in the plurality's reasoning that death ordinarily is disproportionate punishment for the crime of raping an adult woman. *Id.,* at 601. Nothing in the *Coker* analysis suggests that principles of disproportionality are applicable only

curring); *id.,* at 457–458 (POWELL, J., dissenting, joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ.).

[9] *Id.,* at 266 (BRENNAN, J., concurring); *id.,* at 329 (MARSHALL, J., concurring); *id.,* at 382 (BURGER, C. J., dissenting, joined by BLACKMUN, POWELL, and REHNQUIST, JJ.); *id.,* at 409 (BLACKMUN, J., dissenting); *id.,* at 420 (POWELL, J., dissenting, joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ.).

[10] The *Coker* standard derived from the joint opinion in *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (opinion of STEWART, POWELL, and STEVENS, JJ.), which stated that "the inquiry into 'excessiveness' has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain. . . . Second, the punishment must not be grossly out of proportion to the severity of the crime."

to capital cases. Indeed, the questions posed in *Coker* and this case are the same: whether a punishment that can be imposed for one offense is grossly disproportionate when imposed for another.

In sum, a few basic principles emerge from the history of the Eighth Amendment. Both barbarous forms of punishment and grossly excessive punishments are cruel and unusual. A sentence may be excessive if it serves no acceptable social purpose, or is grossly disproportionate to the seriousness of the crime. The principle of disproportionality has been acknowledged to apply to both capital and noncapital sentences.

## III

Under Texas law, petitioner has been sentenced to a mandatory life sentence. Even so, the Court of Appeals rejected the petitioner's Eighth Amendment claim primarily because it concluded that the petitioner probably would not serve a life sentence. 587 F 2d, at 659 (en banc). In view of good-time credits available under the Texas system, the court concluded that Rummel might serve no more than 10 years. *Ibid.* Thus, the Court of Appeals equated petitioner's sentence to 10 years of imprisonment without the possibility of parole. *Id.*, at 660.

It is true that imposition in Texas of a mandatory life sentence does not necessarily mean that petitioner will spend the rest of his life behind prison walls. If petitioner attains sufficient good-time credits, he may be eligible for parole within 10 or 12 years after he begins serving his life sentence. But petitioner will have no right to early release; he will merely be eligible for parole. And parole is simply an act of executive grace.

Last Term in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979), we held that a criminal conviction extinguishes whatever liberty interest a prisoner has in securing freedom before the end of his lawful sentence. The Court stated unequivocally that a convicted person has "no constitutional or

inherent right . . . to be conditionally released before the expiration of a valid sentence." *Id.*, at 7. Of course, a State may create legitimate expectations that are entitled to procedural protection under the Due Process Clause of the Fourteenth Amendment, but Texas has not chosen to create a cognizable interest in parole. The Court of Appeals for the Fifth Circuit has held that a Texas prisoner has no constitutionally enforceable interest in being freed before the expiration of his sentence. See *Johnson* v. *Wells*, 566 F. 2d 1016, 1018 (1978); *Craft* v. *Texas Board of Pardons and Paroles*, 550 F. 2d 1054, 1056 (1977).

A holding that the possibility of parole discounts a prisoner's sentence for the purposes of the Eighth Amendment would be cruelly ironic. The combined effect of our holdings under the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment would allow a State to defend an Eighth Amendment claim by contending that parole is probable even though the prisoner cannot enforce that expectation. Such an approach is inconsistent with the Eighth Amendment. The Court has never before failed to examine a prisoner's Eighth Amendment claim because of the speculation that he might be pardoned before the sentence was carried out.

Recent events in Texas demonstrate that parole remains a matter of executive grace. In June 1979, the Governor of Texas refused to grant parole to 79% of the state prisoners whom the parole board recommended for release.[11] The State's chief executive acted well within his rights in declining to follow the board, but his actions emphasize the speculative nature of the Court of Appeals' reasoning. As this case comes to us, petitioner has been deprived by operation of state law of his right to freedom from imprisonment for the rest of his life. We should judge the case accordingly.

---

[11] Austin American-Statesman, Sept. 23, 1979, p. A1, col. 4. The newspaper reported that in a 6-month period including June 1979, the Governor rejected 33% of the parole board recommendations that prisoners be released. *Ibid.*

## IV

The Eighth Amendment commands this Court to enforce the constitutional limitation of the Cruel and Unusual Punishments Clause. In discharging this responsibility, we should minimize the risk of constitutionalizing the personal predilictions of federal judges by relying upon certain objective factors. Among these are (i) the nature of the offense, see *Coker* v. *Georgia*, 433 U. S., at 598; *id.*, at 603 (POWELL, J:, concurring in judgment in part and dissenting in part); (ii) the sentence imposed for commission of the same crime in other jurisdictions, see *id.*, at 593–594; *Gregg* v. *Georgia*, 428 U. S., at 179–180; *Weems* v. *United States*, 217 U. S., at 380; cf. *Trop* v. *Dulles*, 356 U. S., at 102–103; and (iii) the sentence imposed upon other criminals in the same jurisdiction, *Weems* v. *United States, supra,* at 380–381.

## A

Each of the crimes that underlies the petitioner's conviction as a habitual offender involves the use of fraud to obtain small sums of money ranging from $28.36 to $120.75. In total, the three crimes involved slightly less than $230. None of the crimes involved injury to one's person, threat of injury to one's person, violence, the threat of violence, or the use of a weapon. Nor does the commission of any such crimes ordinarily involve a threat of violent action against another person or his property. It is difficult to imagine felonies that pose less danger to the peace and good order of a civilized society than the three crimes committed by the petitioner. Indeed, the state legislature's recodification of its criminal law supports this conclusion. Since the petitioner was convicted as a habitual offender, the State has reclassified his third offense, theft by false pretext, as a misdemeanor. Tex. Penal Code Ann. § 31.03 (d)(3) (Supp. 1980).[12]

---

[12] The Court suggests that an inquiry into the nature of the offense at issue in this case inevitably involves identifying subjective distinctions beyond the province of the judiciary. *Ante,* at 275–276. Yet the distinc-

## B

Apparently, only 12 States have ever enacted habitual offender statutes imposing a mandatory life sentence for the commission of two or three nonviolent felonies and only 3, Texas, Washington, and West Virginia, have retained such a statute.[13] Thus, three-fourths of the States that experimented

tion between forging a check for $28 and committing a violent crime or one that threatens violence is surely no more difficult for the judiciary to perceive than the distinction between the gravity of murder and rape. See *Coker* v. *Georgia*, 433 U. S. 584, 598 (1977); *id.*, at 603 (POWELL, J., concurring in judgment in part and dissenting in part). I do not suggest that all criminal acts may be separated into precisely identifiable compartments. A professional seller of addictive drugs may inflict greater bodily harm upon members of society than the person who commits a single assault. But the difficulties of line-drawing that might be presented in other cases need not obscure our vision here.

[13] The nine States that previously enforced such laws include: (1) California, 1927 Cal. Stats., ch. 634, § 1, p. 1066, repealed, 1935 Cal. Stats., ch. 602–603, p. 1699; ch. 754, § 1, p. 2121. See Cal. Penal Code Ann. § 667.5 (West Supp. 1979) (Habitual offender statute allows no more than three years' additional sentence for the commission of a previous felony). (2) Indiana, 1907 Ind. Acts, ch. 82, § 1, p. 109, repealed, 1977 Ind. Acts No. 340, § 121, p. 1594. See Ind. Code § 35–50–2–8 (Supp. 1979) (30 years' additional sentence upon the conviction of a third felony). (3) Kansas, 1927 Kan. Sess. Laws, ch. 191, § 1, p. 247, repealed, 1939 Kan. Sess. Laws, ch. 178, § 1, p. 299. See 1978 Kan. Sess. Laws, ch. 120, § 4 (2) (Up to the treble maximum penalty may be given upon the commission of the third felony). (4) Kentucky, 1893 Ky. Acts, ch. 182, Art. I, § 4, p. 757, repealed, 1974 Ky. Acts, ch. 406, § 280, p. 873. See Ky. Rev. Stat. § 532.080 (Supp. 1978) (A persistent felony offender may receive a discretionary life sentence upon the conviction of a Class A or B felony). (5) Massachusetts, 1818 Mass. Acts, ch. 176, §§ 5–6, p. 603, repealed, 1833 Mass. Acts, ch. 85, p. 618. See Mass. Gen. Laws Ann., ch. 279, § 25 (West 1972) (A person convicted of three specified felonies receives the maximum penalty provided for the third offense). (6) New York, 1796 N. Y. Laws, ch. 30, p. 669, repealed, 1881 N. Y. Laws, ch. 676, §§ 688–690, p. 181. See N. Y. Penal Code §§ 70.04, 70.06–70.10 (McKinney 1975 and Supp. 1979–1980) (mandatory life imprisonment upon the conviction for a third violent felony). (7) Ohio, 1885 Ohio Leg. Acts, No. 751, § 2, p. 236, repealed, 1929 Ohio Leg. Acts, No. 8, §§ 1–2, p. 40. See Ohio

with the Texas scheme appear to have decided that the impo-
sition of a mandatory life sentence upon some persons who
have committed three felonies represents excess punishment.
Kentucky, for example, replaced the mandatory life sentence
with a more flexible scheme "because of a judgment that under
some circumstances life imprisonment for an habitual criminal
is not justified. An example would be an offender who has
committed three Class D felonies, none involving injury to
person." Commentary following Criminal Law of Kentucky
Annotated, Penal Code § 532.080, p. 790 (1978). The State
of Kansas abolished its statute mandating a life sentence for
the commission of three felonies after a state legislative com-
mission concluded that "[t]he legislative policy as expressed
in the habitual criminal law bears no particular resemblance
to the enforcement policy of prosecutors and judges." Kan-
sas Legislative Council, The Operation of the Kansas Habit-
ual Criminal Law, Pub. No. 47, p. 4 (1936). In the eight
years following enactment of the Kansas statute, only 96 of
the 733 defendants who committed their third felony were
sentenced to life imprisonment. *Id.*, at 32–33. This statistic
strongly supports the belief that prosecutors and judges
thought the habitual offender statute too severe.[14] In Wash-

---

Rev. Code Ann. §§ 2929.01, 2929.11, 2929.12 (Supp. 1979) (no mandatory
habitual offender penalties). (8) Oregon, 1921 Ore. Laws, ch. 70, § 1,
p. 97, repealed, 1927 Ore. Laws, ch. 334, §§ 1–3, p. 432. See Ore. Rev.
Stat. §§ 161.725, 166.230 (1977) (life sentence upon conviction of fourth
armed felony or attempted felony). (9) Virginia, 1848 Va. Acts, ch. 199,
§ 26, p. 752, repealed, 1916 Va. Acts, chs. 29–30, pp. 34–35. See 1979 Va.
Acts, ch. 411 (no habitual offender statute).

In addition to Texas, Washington, see Wash. Rev. Code § 9.92.090
(1976), and West Virginia, see W. Va. Code § 61–11–18 (1977), continue
to provide mandatory life imprisonment upon the commission of a third
nonviolent felony.

[14] See Note, The Kansas Habitual Criminal Act, 9 Washburn L. J. 244,
247–250 (1970); see also *State v. Lee*, 87 Wash. 2d 932, 940–942, 558 P.
2d 236, 241–242 (1976) (Rosellini, J., dissenting); *State* v. *Thomas*, 16
Wash. App. 1, 13–15, 553 P. 2d 1357, 1365–1366 (1976); Commentary fol-

ington, which retains the Texas rule, the State Supreme Court has suggested that application of its statute to persons like the petitioner might constitute cruel and unusual punishment. See *State* v. *Lee,* 87 Wash. 2d 932, 937, n. 4, 558 P. 2d 236, 240, n. 4 (1976).

More than three-quarters of American jurisdictions have never adopted a habitual offender statute that would commit the petitioner to mandatory life imprisonment. The jurisdictions that currently employ habitual offender statutes either (i) require the commission of more than three offenses,[15] (ii) require the commission of at least one violent crime,[16] (iii) limit a mandatory penalty to less than life,[17] or (iv) grant discretion to the sentencing authority.[18] In none of the

lowing Criminal Law of Kentucky Annotated, Penal Code § 532.080, p. 790 (1978).

[15] Four States impose a mandatory life sentence upon the commission of a fourth felony. See Colo. Rev. Stat. § 16–13–101 (2) (1978); Nev. Rev. Stat. § 207.010 (2) (1977); S. D. Comp. Laws Ann. §§ 22–6–1, 22–7–8 (1979); Wyo. Stat. § 6–1–110 (1977). Thus, even if the line between these States and Texas, West Virginia, and Washington, is "subtle rather than gross," *ante,* at 279, the most that one can say is that 7 of the 50 States punish the commission of four or fewer felonies with a mandatory life sentence.

[16] See, *e. g.,* Del. Code Ann., Tit. 11, §§ 4214, 4215 (1975 and Supp. 1978) (mandatory life sentence for one who has committed two felonies and commits a third specified felony involving violence or the threat of violence); Miss. Code Ann. § 99–19–83 (Supp. 1979) (mandatory life sentence for one who commits three felonies at least one of which is violent).

[17] See, *e. g.,* N. M. Stat. Ann. § 31–18–17 (Supp. 1979) (Persons who have committed two felonies punishable by at least one year in prison receive four years' additional sentence upon the commission of a third felony and eight years upon the commission of a fourth felony); Wis. Stat. § 939.62 (1977) (Persons who have committed one felony within 5 years may be sentenced to 10 years' additional sentence upon the commission of an offense punishable by a term greater than 10 years).

[18] See, *e. g.,* D. C. Code § 22–104a (1973) (Persons who commit three felonies may be sentenced to life); Idaho Code § 19–2514 (1979) (Persons who have committed three felonies may receive a sentence ranging from

jurisdictions could the petitioner have received a mandatory life sentence merely upon the showing that he committed three nonviolent property-related offenses.[19]

The federal habitual offender statute also differs materially from the Texas statute. Title 18 U. S. C. § 3575 provides increased sentences for "dangerous special offenders" who have been convicted of a felony. A defendant is a "dangerous special offender" if he has committed two or more previous felonies, one of them within the last five years, if the current felony arose from a pattern of conduct "which constituted a substantial source of his income, and in which he manifested special skill or expertise," or if the felony involved a criminal conspiracy in which the defendant played a supervisory role. § 3575 (e). Federal courts may sentence such persons "to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony."

---

five years to life). Statutes that permit the imposition of a discretionary life sentence for the commission of three felonies are fundamentally different from the statute under review in this case. In a discretionary jurisdiction, the question at sentencing is whether a three-time felon has engaged in behavior other than the commission of three felonies that justifies the imposition of the maximum permissible sentence. In such a jurisdiction, therefore, other evidence of dangerousness may justify imposition of a life sentence. In Texas, a person receives a mandatory life sentence merely because he is a three-time felon.

[19] A State's choice of a sentence will, of course, never be unconstitutional simply because the penalty is harsher than the sentence imposed by other States for the same crime. Such a rule would be inconsistent with principles of federalism. The Eighth Amendment prohibits grossly disproportionate punishment, but it does not require local sentencing decisions to be controlled by majority vote of the States. Nevertheless, a comparison of the Texas standard with the sentencing statutes of other States is one method of "assess[ing] contemporary values concerning the infliction of a challenged sanction." *Gregg* v. *Georgia*, 428 U. S., at 173 (opinion of STEWART, POWELL, and STEVENS, JJ.). The relevant objective factors should be considered together and, although the weight assigned to each may vary, no single factor will ever be controlling.

§ 3575 (b).[20]  Thus, Congress and an overwhelming number of state legislatures have not adopted the Texas scheme.  These legislative decisions lend credence to the view that a mandatory life sentence for the commission of three nonviolent felonies is unconstitutionally disproportionate.[21]

## C

Finally, it is necessary to examine the punishment that Texas provides for other criminals.  First and second offenders who commit more serious crimes than the petitioner may receive markedly less severe sentences.  The only first-time offender subject to a mandatory life sentence is a person

[20] The proportionality principle was incorporated into the bill after the Senate Judiciary Committee heard testimony that a sentencing authority considering the punishment due a dangerous special offender should "examine each substantive offense and make some determination based upon the gravity of that offense as to the ultimate maximum which seems to be wise."  Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 205 (1969) (testimony of Professor Peter W. Low of the University of Virginia School of Law).  See Katkin, Habitual Offender Laws: A Reconsideration, 21 Buffalo L. Rev. 99, 118 (1972).

[21] The American Law Institute proposes that a felon be sentenced to an extended term of punishment only if he is a persistent offender, professional criminal, dangerous mentally abnormal person whose extended commitment is necessary for the protection of the public, or "a multiple offender whose criminality was so extensive that a sentence of imprisonment for an extended term is warranted."  ALI, Model Penal Code § 7.03 (Prop. Off. Draft 1962).  The term for a multiple offender may not exceed the longest sentences of imprisonment authorized for each of the offender's crimes if they ran consecutively.  *Ibid.*  Under this proposal the petitioner could have been sentenced up to 25 years.  *Ante,* at 269.

The American Bar Association has proposed that habitual offenders be sentenced to no more than 25 years and that "[a]ny increased term which can be imposed because of prior criminality should be related in severity to the sentence otherwise provided for the new offense."  The choice of sentence would be left to the discretion of the sentencing court.  ABA Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 3.3 (App. Draft 1968).

convicted of capital murder. Tex. Penal Code §§ 12.31, 19.03 (1974). A person who commits a first-degree felony, including murder, aggravated kidnaping, or aggravated rape, may be imprisoned from 5 to 99 years. §§ 19.02, 21.03; 12.32 (1974 and Supp. 1980). Persons who commit a second-degree felony, including voluntary manslaughter, rape, or robbery, may be punished with a sentence of between 2 and 20 years. § 12.33 (1974). A person who commits a second felony is punished as if he had committed a felony of the next higher degree. §§ 12.42 (a)–(b) (1974). Thus, a person who rapes twice may receive a 5-year sentence. He also may, but need not, receive a sentence functionally equivalent to life imprisonment.

The State argues that these comparisons are not illuminating because a three-time recidivist may be sentenced more harshly than a first-time offender. Of course, the State may mandate extra punishment for a recidivist. See *Oyler* v. *Boles,* 368 U. S. 448 (1962). In Texas a person convicted twice of the unauthorized use of a vehicle receives a greater sentence than a person once convicted for that crime, but he does not receive a sentence as great as a person who rapes twice. Compare §§ 12.42 (a) and 31.07 with § 12.42 (b); § 21.02 (1974 and Supp. 1980). Such a statutory scheme demonstrates that the state legislature has attempted to choose a punishment in proportion to the nature and number of offenses committed.

Texas recognizes when it sentences two-time offenders that the amount of punishment should vary with the severity of the offenses committed. But all three-time felons receive the same sentence. In my view, imposition of the same punishment upon persons who have committed completely different types of crimes raises serious doubts about the proportionality of the sentence applied to the least harmful offender. Of course, the Constitution does not bar mandatory sentences. I merely note that the operation of the Texas habitual offender system raises a further question about the extent to which a

mandatory life sentence, no doubt a suitable sentence for a person who has committed three violent crimes, also is a proportionate punishment for a person who has committed the three crimes involved in this case.

## D

Examination of the objective factors traditionally employed by the Court to assess the proportionality of a sentence demonstrates that petitioner suffers a cruel and unusual punishment. Petitioner has been sentenced to the penultimate criminal penalty because he committed three offenses defrauding others of about $230. The nature of the crimes does not suggest that petitioner ever engaged in conduct that threatened another's person, involved a trespass, or endangered in any way the peace of society. A comparison of the sentence petitioner received with the sentences provided by habitual offender statutes of other American jurisdictions demonstrates that only two other States authorize the same punishment. A comparison of petitioner to other criminals sentenced in Texas shows that he has been punished for three property-related offenses with a harsher sentence than that given first-time offenders or two-time offenders convicted of far more serious offenses. The Texas system assumes that all three-time offenders deserve the same punishment whether they commit three murders or cash three fraudulent checks.

The petitioner has committed criminal acts for which he may be punished. He has been given a sentence that is not inherently barbarous. But the relationship between the criminal acts and the sentence is grossly disproportionate. For having defrauded others of about $230, the State of Texas has deprived petitioner of his freedom for the rest of his life. The State has not attempted to justify the sentence as necessary either to deter other persons or to isolate a potentially violent individual. Nor has petitioner's status as a habitual offender been shown to justify a mandatory life sentence. My view, informed by examination of the "objective indicia

that reflect the public attitude toward a given sanction," *Gregg* v. *Georgia,* 428 U. S., at 173, is that this punishment violates the principle of proportionality contained within the Cruel and Unusual Punishments Clause.

## V

The Court today agrees with the State's arguments that a decision in petitioner's favor would violate principles of federalism and, because of difficulty in formulating standards to guide the decision of the federal courts, would lead to excessive interference with state sentencing decisions. Neither contention is convincing.

Each State has sovereign responsibilities to promulgate and enforce its criminal law. In our federal system we should never forget that the Constitution "recognizes and preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments." *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 78–79 (1938), quoting *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368, 401 (1893) (Field, J., dissenting). But even as the Constitution recognizes a sphere of state activity free from federal interference, it explicitly compels the States to follow certain constitutional commands. When we apply the Cruel and Unusual Punishments Clause against the States, we merely enforce an obligation that the Constitution has created. As MR. JUSTICE REHNQUIST has stated, "[c]ourts are exercising no more than the judicial function conferred upon them by Art. III of the Constitution when they assess, in a case before them, whether or not a particular legislative enactment is within the authority granted by the Constitution to the enacting body, and whether it runs afoul of some limitation placed by the Constitution on the authority of that body." *Furman* v. *Georgia,* 408 U. S., at 466 (dissenting opinion). See *Weems* v. *United States,* 217 U. S., at 379.

Because the State believes that the federal courts can formulate no practicable standard to identify grossly dispropor-

tionate sentences, it fears that the courts would intervene into state criminal justice systems at will. Such a "floodgates" argument can be easy to make and difficult to rebut. But in this case we can identify and apply objective criteria that reflect constitutional standards of punishment and minimize the risk of judicial subjectivity. Moreover, we can rely upon the experience of the United States Court of Appeals for the Fourth Circuit in applying criteria similar to those that I believe should govern this case.

In 1974, the Fourth Circuit considered the claim of a West Virginia prisoner who alleged that the imposition of a mandatory life sentence for three nonviolent crimes violated the Eighth Amendment. In *Hart* v. *Coiner*, 483 F. 2d 136 (1973), cert. denied, 415 U. S. 983 (1974), the court held that the mandatory sentence was unconstitutional as applied to the prisoner. The court noted that none of the offenses involved violence or the danger of violence, that only a few States would apply such a sentence, and that West Virginia gave less severe sentences to first- and second-time offenders who committed more serious offenses. The holding in *Hart* v. *Coiner* is the holding that the State contends will undercut the ability of the States to exercise independent sentencing authority. Yet the Fourth Circuit subsequently has found only twice that noncapital sentences violate the Eighth Amendment. In *Davis* v. *Davis*, 601 F. 2d 153 (1979) (en banc), the court held that a 40-year sentence for possession and distribution of less than nine ounces of marihuana was cruel and unusual. In *Roberts* v. *Collins*, 544 F. 2d 168 (1976), the court held that a person could not receive a longer sentence for a lesser included offense (assault) than he could have received for the greater offense (assault with intent to murder).[22]

---

[22] In *Ralph* v. *Warden*, 438 F. 2d 786 (1970); the Fourth Circuit also applied the Eighth Amendment to hold that rape may not be punished by death. This Court reached the same result seven years later in *Coker* v. *Georgia*, 433 U. S. 584 (1977).

More significant are those cases in which the Fourth Circuit held that the principles of *Hart* v. *Coiner* were inapplicable. In a case decided the same day as *Hart* v. *Coiner*, the Court of Appeals held that a 10-year sentence given for two obscene telephone calls did not violate the Cruel and Unusual Punishments Clause. The court stated that "[w]hatever may be our subjective view of the matter, we fail to discern here objective factors establishing disproportionality in violation of the eighth amendment." *Wood* v. *South Carolina*, 483 F. 2d 149, 150 (1973). In *Griffin* v. *Warden*, 517 F. 2d 756 (1975), the court refused to hold that the West Virginia statute was unconstitutionally applied to a person who had been convicted of breaking and entering a gasoline and grocery store, burglary of a residence, and grand larceny. The court distinguished *Hart* v. *Coiner* on the ground that Griffin's offenses "clearly involve the potentiality of violence and danger to life as well as property." 517 F. 2d, at 757. Similarly, the Fourth Circuit turned aside an Eighth Amendment challenge to the imposition of a 10- to 20-year sentence for statutory rape of a 13-year-old female. *Hall* v. *McKenzie*, 537 F. 2d 1232, 1235–1236 (1976). The court emphasized that the sentence was less severe than a mandatory life sentence; that the petitioner would have received a similar sentence in 17 other American jurisdictions, and that the crime involved violation of personal integrity and the potential of physical injury. The Fourth Circuit also has rejected Eighth Amendment challenges brought by persons sentenced to 12 years for possession and distribution of heroin, *United States* v. *Atkinson*, 513 F. 2d 38, 42 (1975), 2 years for unlawful possession of a firearm, *United States* v. *Wooten*, 503 F. 2d 65, 67 (1974), 15 years for assault with intent to commit murder, *Robinson* v. *Warden*, 455 F. 2d 1172 (1972), and 40 years for kidnaping, *United States* v. *Martell*, 335 F. 2d 764 (1964).[23]

---

[23] The Fourth Circuit also has held that a sentence of eight years for possessing a firearm as a convicted felon, given to a felon previously con-

I do not suggest that each of the decisions in which the Court of Appeals for the Fourth Circuit applied *Hart* v. *Coiner* is necessarily correct. But I do believe that the body of Eighth Amendment law that has developed in that Circuit constitutes impressive empirical evidence that the federal courts are capable of applying the Eighth Amendment to disproportionate noncapital sentences with a high degree of sensitivity to principles of federalism and state autonomy.[24]

## VI

I recognize that the difference between the petitioner's grossly disproportionate sentence and other prisoners' constitutionally valid sentences is not separated by the clear distinction that separates capital from noncapital punishment. "But the fact that a line has to be drawn somewhere does not justify its being drawn anywhere." *Pearce* v. *Commissioner*, 315 U. S. 543, 558 (1942) (Frankfurter, J., dissenting). The

victed of manslaughter and breaking and entering, was not disproportionate under 18 U. S. C. § 3575. *United States* v. *Williamson*, 567 F. 2d 610, 616 (1977). See n. 20, *supra*, and accompanying text.

[24] The District Courts in the Fourth Circuit also have applied the Eighth Amendment carefully. Although one District Court has held that a sentence of 48 years for safecracking is constitutionally disproportionate, see *Thacker* v. *Garrison*, 445 F. Supp. 376 (WDNC 1978), other District Courts have found no constitutional infirmity in the disenfranchisement of convicted persons, *Thiess* v. *State Board*, 387 F. Supp. 1038, 1042 (Md. 1974) (three-judge court), a 5-year sentence for distributing marihuana, *Queen* v. *Leeke*, 457 F. Supp. 476 (SC 1978), and a 5-year sentence for possession of marihuana with intent to distribute that was suspended for 20 years on condition of payment of a $1,500 fine and nine months in jail. *Wolkind* v. *Selph*, 473 F. Supp. 675 (ED Va. 1979.)

Supreme Courts in two States within the Fourth Circuit have upheld as constitutional a 20-year sentence for a person convicted of burglary who had a prior conviction for armed robbery, *Martin* v. *Leverette*, —— W. Va. ——, ———, 244 S. E. 2d 39, 43–44 (1978), and a life sentence for murder, *Simmons* v. *State*, 264 S. C. 417, 420, 215 S. E. 2d 883, 884 (1975).

Court has, in my view, chosen the easiest line rather than the best.[25]

It is also true that this Court has not heretofore invalidated a mandatory life sentence under the Eighth Amendment. Yet our precedents establish that the duty to review the disproportionality of sentences extends to noncapital cases. *Supra,* at 289–293. The reach of the Eighth Amendment cannot be restricted only to those claims previously adjudicated under the Cruel and Unusual Punishments Clause. "Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is particularly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.'" *Weems* v. *United States,* 217 U. S., at 373.

We are construing a living Constitution. The sentence imposed upon the petitioner would be viewed as grossly unjust by virtually every layman and lawyer. In my view, objective criteria clearly establish that a mandatory life sentence for defrauding persons of about $230 crosses any rationally drawn line separating punishment that lawfully may be imposed from that which is proscribed by the Eighth Amendment. I would reverse the decision of the Court of Appeals.

---

[25] The Court concedes, as it must, that a mandatory life sentence may be constitutionally disproportionate to the severity of an offense. *Ante,* at 274, n. 11. Yet its opinion suggests no basis in principle for distinguishing between permissible and grossly disproportionate life imprisonment.