Robert STEELE, Jr., Petitioner,

v.

Pamela WITHROW, Respondent.

No. 00–CV–74202–DT.

United States District Court,
E.D. Michigan,
Southern Division.

June 12, 2001.

Robert Steele, Michigan Reformatory, Ionia, MI, pro se.

Brenda E. Turner, Vincent J. Leone, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for respondent.

## *OPINION*

DUGGAN, District Judge.

Petitioner Robert Steele, Jr., presently confined at the Michigan Reformatory in Ionia, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, Petitioner challenges his conviction on one count of assault with intent to commit murder, MICH.COMP.LAWS § 750.83, and one count of possession of a firearm in the commission of a felony, MICH.COMP.LAWS § 750.227b. Petitioner, who was fifteen at the time of the incident in question, asserts that he is entitled to habeas relief on these convictions because (1) the evidence presented at trial was insufficient to support a finding of the specific intent to kill and (2) the trial court abused its discretion and violated his rights under the Eighth and Fourteenth Amendments when it sentenced him as an adult. For the reasons stated below, Petitioner's application for writ of habeas corpus shall be denied.

### *Background*

Petitioner's convictions arose out of a neighborhood dispute in Flint, Michigan. Because Petitioner attacks the sufficiency of the evidence in this case, the Court shall briefly summarize the testimony presented against him at trial.

Andrea Smoots, the victim in this case, testified that during the evening of June 21, 1995, she had an altercation with Defendant's older sister, Michelle Steele, during which she slapped Michelle across the face. At the time, Smoots was accompanied by Mara Keel and Quoia Caldwell. After the altercation with Michelle Steele, Smoots, Keel, and Caldwell went to another friend's birthday party. Around midnight, Smoots telephoned Michelle from the party and, believing they were going to either talk about, or fight over, the earlier incident, Smoots, Keel, and Caldwell drove over to Michelle's house. Upon approaching Michelle's house, Smoots saw Michelle come out of her house and drive away. Smoots, accompanied by Keel and Caldwell, followed Michelle in their car. Michelle stopped at an apartment and picked up two black males, at which point Smoots drove by and continued to a school parking lot. Michelle and the two individuals she had picked up followed Smoots to the school parking lot. Michelle's two passengers exited the vehicle at which point, according to Smoots, "one just looked like they had a gun so I left." Smoots did not recognize either of the two men. Smoots returned to her friend's birthday party.

Smoots, Keel, and Caldwell left the party at approximately three o'clock the next morning in Keel's car with Smoots driving. As Smoots traveled toward Michelle's

house on the way to take a friend home, Michelle "pulled up from out of nowhere," accompanied by Petitioner in the passenger seat. Michelle "whipped up" along side of the car driven by Smoots, at which point Smoots stopped. Petitioner walked up to Smoots, tried to open her car door but was unsuccessful, and with his hand behind his back said "which one of you 'hoes got a beef with my sister?" Smoots drove off.

Michelle and Petitioner chased Smoots' vehicle to Claudia Miller's house. Smoots pulled into Miller's driveway, at which point she heard about eight or nine gun shots. Smoots looked at Michelle's car and saw Petitioner hanging out of the passenger side window with his arm extended toward Smoots's vehicle. According to Smoots, Petitioner had a gun in his hand and was shooting at them. Michelle and Petitioner left, and Smoots, Keel, and Caldwell ran into the house and called the police.

Mara Keel essentially corroborated Smoots's testimony. Keel also testified that when she got home after the incident that morning, she had an anonymous call on her answering machine. Keel dialed star–69 to see who the last caller was. The man who answered the phone identified himself as the Petitioner. Although at trial she didn't remember him making such a statement, Keel testified at an earlier hearing that Petitioner told her over the telephone that he "was trying to kill that damn girl."

Officer William Tate, who responded to the 911 call, testified that the right rear tire on the vehicle driven by Smoots appeared to be "shot out," and that there were bullet holes in the right side of the bumper and an inside panel. Officer Tate

also found approximately three bullet holes in the siding of the house, and that one window had been broken.

Petitioner presented alibi testimony from his mother, his girlfriend, and one of his sister's friends.[1] Petitioner also testified on his own behalf. The jury found Petitioner guilty of both charges. Although Petitioner was only fifteen years old at the time of the shooting, he was charged as an adult under Michigan's automatic waiver statute. *See* MICH.COMP.LAWS § 769.1. Petitioner was sentenced as an adult to thirteen to twenty-five years imprisonment on the assault with intent to commit murder conviction, and a consecutive two years imprisonment on the felony-firearm conviction.

Petitioner's conviction was affirmed on appeal to the Michigan Court of Appeals, and the Michigan Supreme Court denied leave. *People v. Steele*, No. 202651 (Mich. Ct.App. Oct. 22, 1999), *leave denied* 462 Mich. 866, 616 N.W.2d 689 (2000).

### *Discussion*

■ Petitioner now seeks a writ of habeas corpus. The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") govern this case because Petitioner filed his habeas application after the effective date of the AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

1. The testimony of Michelle Steele's friend actually went to establishing an alibi for Michelle, who had passed away prior to trial.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997).

With respect to the "contrary to" clause, there are two situations in which a state court decision is contrary to clearly established federal law. First, a state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth by the Supreme Court. Second, a state-court decision is contrary to clearly established federal law if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 402–06, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000).

■ "[R]un-of-the-mill state-court decision[s]" that apply the correct legal rule do not fit comfortably within the "contrary to" clause and therefore, must be reviewed under the "unreasonable application" language of § 2254(d)(1). *Id.* at 406, 120 S.Ct. at 1520. A federal court making an "unreasonable application" inquiry must ask whether the state court's application of clearly established federal law was objectively unreasonable. *Id.* at 409, 120 S.Ct. at 1521. An unreasonable application of federal law is different from an incorrect application of federal law. Thus, a federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable. *Id.* at 411, 120 S.Ct. at 1522.

■ Finally, the term "clearly established federal law" refers to the holdings, as opposed to the dicta, of the United States Supreme Court's decisions at the time of the relevant state court decision. *Id.,* 120 S.Ct. at 1523.

*I. Sufficiency of Evidence*

■ Petitioner first attacks the sufficiency of the evidence presented against him by asserting that the evidence presented at trial was insufficient to establish a specific intent to kill. Petitioner contends that at best, the evidence merely shows that Petitioner intended to frighten the young women in retaliation for the way that Smoots treated his sister.

■ A habeas court reviews sufficiency-of-the-evidence claims by asking whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir.2000) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* 531 U.S. 1021, 121 S.Ct. 588, 148 L.Ed.2d 503 (2000). When making such an inquiry, the reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed during trial. *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). It is the province of the factfinder, not this Court, to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris,* 972 F.2d 675, 679 (6th Cir.1992).

The elements of assault with intent to commit murder under Michigan law are: (1) an assault; (2) with an actual intent to kill; (3) which if successful, would make the killing murder. *People v. Hoffman,* 225 Mich.App. 103, 111, 570 N.W.2d 146 (1997). A conviction for assault with intent to commit murder must be premised upon a defendant's specific intent to kill. *People v. Edwards,* 171 Mich.App. 613, 620, 431 N.W.2d 83 (1988). The intent to do great bodily harm, or a wanton and wilful disregard of the likelihood that the tendency of the action is to cause death or great bodily harm, while sufficient to support a conviction for murder, is insufficient to support a conviction for assault with intent·to commit murder. *People v. Taylor,* 422 Mich. 554, 567–68, 375 N.W.2d 1 (1985). The intent to kill, however, need not be proven by direct, positive, or independent evidence; the trier of fact may draw reasonable inferences from the facts and evidence in determining the existence of an intent to kill. *Id.* Under Michigan law, the use of a lethal weapon supports an inference of an intent to kill. *People v. Ray,* 56 Mich.App. 610, 615, 224 N.W.2d 735 (1974).

Applying the correct legal standard, the Michigan court of appeals rejected Petitioner's claim, finding that viewing the testimony summarized above in a light most favorable to the prosecution, a rational jury could find beyond a reasonable doubt that Petitioner possessed the requisite intent to kill. This Court agrees.

The evidence established that Smoots and Petitioner's sister had been involved in a dispute only hours prior to the shooting. Petitioner subsequently confronted Smoots and her two friends and attempted to open the door of the car that they were driving. When Smoots drove off, Petitioner and his sister chased after them. While Smoots was still in the car, some eight to nine gunshots were fired. Police discovered bullet holes in the right side of Smoots's car and in the side of Claudia Miller's house. Petitioner subsequently told Keel that at the time of the shooting, he "was trying to kill that damn girl." Smoots also testified that she saw Petitioner leaning out of the car window with his arm extended towards the vehicle she was in, that he was holding a gun in his hand, and that he was firing the gun directly at them. When viewed in a light most favorable to the prosecution, this evidence is sufficient to support a finding by the jury that Petitioner possessed the requisite specific intent to kill. Therefore, this Court is satisfied that the court of appeals's decision was neither contrary to, nor an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented at trial.

## II. Juvenile Sentencing Claim

As his second claim, Petitioner asserts that the trial court abused its discretion in sentencing him as an adult. Specifically, Petitioner contends that the trial court erred in finding that he would not be amenable to treatment in a juvenile facility and that his best chance for rehabilitation would occur in the adult prison system. Petitioner also claims that the sentence imposed in this case was disproportionate to the offense and the offender. The Michigan Court of Appeals rejected Petitioner's claims. This Court similarly finds that Petitioner's claims do not entitle him to the relief he seeks.

In general, "there is no constitutional right to any preferred treatment as a juvenile offender." *Stokes v. Fair,* 581 F.2d 287, 289 (1st Cir.1978). In most cases, "the federal government treats the question of whether a defendant is to be charged as an adult criminal or a juvenile

delinquent as one of prosecutorial discretion devoid of most due process guarantees." *Id.* "However, when a state by statute entrusts this determination to the judiciary, more formal mechanisms to insure fundamental fairness are called into play and the statute must be interpreted 'in the context of constitutional principles relating to due process and the assistance of counsel.'" *Id.* (quoting *Kent v. United States,* 383 U.S. 541, 557, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84 (1966)); *see also Oviedo v. Jago,* 809 F.2d 326 (6th Cir.1987); *Keener v. Taylor,* 640 F.2d 839 (6th Cir. 1981); *Hailey v. Dorsey,* 580 F.2d 112 (4th Cir.1978).

At the time of Petitioner's sentencing in 1996, Michigan law required that a trial court having jurisdiction over a juvenile conduct a hearing to determine if the best interests of the juvenile and the public would be served by sentencing the juvenile to a juvenile facility, or by sentencing the juvenile as an adult. Mich.Comp.Laws § 769.1 (1996). In making this determination, the trial court was to consider:

(a) The prior record and character of the juvenile, his or her physical and mental maturity, and his or her pattern of living.

(b) The seriousness and the circumstances of the offense.

(c) Whether the offense is part of a repetitive pattern of offenses which would lead to 1 of the following determinations:

(i) The juvenile is not amenable to treatment.

(ii) That despite the juvenile's potential for treatment, the nature of the juvenile's delinquent behavior is likely to disrupt the rehabilitation of other juveniles in the treatment program.

(d) Whether, despite the juvenile's potential for treatment, the nature of the juvenile's delinquent behavior is likely to render the juvenile dangerous to the public if released at the age of 21.

(e) Whether the juvenile is more likely to be rehabilitated by the services and facilities available in adult programs and procedures than in juvenile programs and procedures.

(f) What is in the best interests of the public welfare and the protection of the public security.

*Id.*

■ Petitioner does not contend that Michigan's procedure violates due process, or that the trial court failed to follow such procedure. Instead, Petitioner asserts that the trial court's findings of fact regarding the criteria set forth in § 769.1(3) were clearly erroneous, specifically, the finding that Petitioner was not amendable to treatment in a juvenile facility. On habeas review, factual determinations by the state court are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the burden of rebutting this presumption of correctness "by clear and convincing evidence." *Id.* In this Court's opinion, Petitioner has failed to sustain this burden.

The trial court conducted a sentencing hearing regarding Petitioner on June 28, 1998, during which the trial court heard testimony from two probation agents for the Michigan Department of Corrections, as well as a social services agent. The trial court also considered a report by an independent psychologist. The first probation agent testified that, in her opinion, Petitioner was not amenable to treatment. (Sentencing Tr. at 19). According to the probation agent, during his time at the juvenile detention center, Petitioner was disruptive, aggravated his peers, was not making any efforts to comply with the juvenile program, and did not want to participate in the group process. (*Id.*). The probation officer also felt that Peti-

tioner would not participate in treatment at the juvenile facility. (*Id.* at 20). Given the crime for which Petitioner had been convicted, his denial of the crime, and his unwillingness to participate in treatment, the probation agent believed that Petitioner would be dangerous if released at twenty-one. (*Id.* at 20–21). The adult system would protect the public for a longer period, while providing the necessary programs on a voluntary, not mandatory basis. (*Id.* at 21).

The social services agent also testified that Petitioner should be sentenced as an adult. (*Id.* at 44). The social services agent's recommendation was based upon a number of factors, including the severity of the crime and Petitioner' reckless disregard for the safety of others, as well as his poor participation in the juvenile system and lack of progress up to that point. (*Id.* at 45–47). Petitioner's pattern of living was also a factor. (*Id.* at 48).

The second probation agent testified that based upon Petitioner's previous conduct at the juvenile center, he was not amenable to treatment as a juvenile, and that the voluntary treatment available at an adult facility would be better suited to Petitioner. (*Id.* at 63).

Based upon the testimony presented during the sentencing hearing, this Court cannot say that the trial court's determination that Petitioner was not amenable to treatment in a juvenile center, or that Petitioner should be sentenced as an adult, was "an unreasonable determination of the facts in light of the evidence presented." Accordingly, Petitioner's argument fails.

 With respect to Petitioner's Eighth Amendment claim, a sentence imposed within statutory limits generally is not subject to habeas review. *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). Furthermore, a sentence within the statutory maximum does not normally constitute cruel and unusual punishment. *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir.2000). Petitioner's sentence of thirteen to twenty-five years was within the statutory sentencing range for the offense of assault with intent to commit murder.

 Furthermore, the United States Constitution does not require strict proportionality, *Harmelin v. Michigan*, 501 U.S. 957, 965, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836 (1991), and successful challenges to proportionality in non-capital cases are "exceedingly rare," *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980). Petitioner has failed to convince the Court that this case fits within the class of "exceedingly rare" claims warranting relief.

*III. Certificate of Appealability*

 28 U.S.C. § 2253 governs appeals in § 2254 proceedings. Section 2253(c)(2) states, in pertinent part: "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *See also Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir.1997). Furthermore, FED.R.APP.P. 22(b) states: "If an appeal is taken by the applicant, the district judge who rendered the judgment shall either issue a certificate of appealability or state the reasons why such a certificate should not issue." *See also Kincade v. Sparkman*, 117 F.3d 949, 953 (6th Cir.1997) (holding that Rule 22(b) requires district courts to make the initial determination of appealability). In granting a certificate of appealability, the Court must indicate the specific issue or issues for which the applicant made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(3).

For the reasons stated above, the Court finds that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability shall not issue in this case.

### *Conclusion*

For the reasons stated above, Petitioner's application for a writ of habeas corpus shall be denied and a certificate of appealability shall not issue in this case.