

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00076-CR

_____

ALONZO GUERRERO AKA ALONZO GUERRERO, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 18F0244-102

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Chief Justice Morriss

# OPINION

In mid-2017, Rebecca Smith's duties as a correctional guard at the Telford Unit of the Texas Department of Criminal Justice (TDCJ) had her conducting a routine security check in C pod of Building 12. Suddenly, she found herself covered and soaked from head to toe in foul liquid feces thrown on her by inmate Alonzo Guerrero.[1] Smith explained that the feces hit her in the face, that her "hair was soaking wet," and that the front of her uniform and her vest were covered. Smith said she "instantly smelled it." "[I]t was almost like he had been saving this stuff for days."[2]

As a result, Guerrero was prosecuted for harassment by a person in a correctional facility,[3] a third-degree felony, was afforded a jury trial, was convicted, had his sentence enhanced by prior convictions and informed by an extensive disciplinary record, and was sentenced to life in prison.[4] In his sole point of error, Guerrero contends that the imposition of a life sentence violated the Eighth Amendment's prohibition of cruel and unusual punishment as being disproportional.

---

[1]Guerrero is also known as Alonzo Guerrero, Jr.

[2]The jury was allowed to view a video recording of the incident.

[3]Section 22.11(a)(1) of the Texas Penal Code states,

> (a) A person commits an offense if, with the intent to assault, harass, or alarm, the person:
>
> (1) while imprisoned or confined in a correctional or detention facility, causes another person to contact the blood, seminal fluid, vaginal fluid, saliva, urine, or feces of the actor, any other person, or an animal . . . ;

*See* TEX. PENAL CODE ANN. § 22.11(a)(1) (West Supp. 2018).

[4]"An individual adjudged guilty of a felony of the third degree shall be punished by imprisonment in the Texas Department of Criminal Justice for any term of not more than 10 years or less than 2 years." TEX. PENAL CODE ANN. § 12.34(a) (West 2011). Guerrero's punishment, however, was enhanced to a life sentence because he had been convicted of two prior felonies. *See* TEX. PENAL CODE ANN. § 12.42(d) (West Supp. 2018).

Because the imposition of a life sentence did not violate the Eighth Amendment, we affirm the judgment of the trial court.

Texas courts have traditionally held that, so long as the punishment assessed is within the range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or unusual. *See Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, the jury found the enhancement paragraphs in the indictment against Guerrero to be true, thereby increasing the punishment range from twenty-five years to ninety-nine years or life in prison. Thus, the jury was within its discretion to assess a life sentence against Guerrero.

However, a prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed is within the range established by the Legislature. *See Jackson v. State*, 989 S.W.2d 842, 845 (Tex. App.—Texarkana 1999, no pet.). The appropriate proportionality analysis under both the Eighth Amendment to the United States Constitution and Article I, Section 13, of the Texas Constitution is guided by (1) the gravity of the offense compared with the harshness of the penalty, (2) the sentences imposed for similar crimes in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions. *See Solem v. Helms*, 463 U.S. 277, 292 (1983); *Simmons v. State*, 944 S.W.2d 11, 15 (Tex. App.—Tyler 1996, pet. ref'd). Notably, only if the initial comparison creates an inference that the sentence is grossly disproportionate to the offense should there be a consideration of the other two *Solem* factors: (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992); *Mullins v. State*, 208

3

S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.). Thus, Guerrero's punishment would be considered "grossly disproportionate to [the] crime only when an objective comparison of the gravity of the offense against the severity of the sentence reveals the sentence to be extreme." *Baldridge v. State*, 77 S.W.3d 890, 893 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1004–06 (1991)).

However, Guerrero was sentenced under the provisions of Section 12.42(d) of the Texas Penal Code. Pursuant to that statute, the sentence reflects the seriousness of his most recent offense, not as it stands alone, but in light of his prior offenses. *See Rummel v. Estelle*, 445 U.S. 263, 276 (1980). A sentence assessed against a repeat offender is "based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes." *Hicks v. State*, 15 S.W.3d 626, 632 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

In considering whether Guerrero's sentence is grossly disproportionate, we are to consider the underlying offense, the enhancements alleged in the indictment, other prior criminal history, and the disciplinary violations he committed during his confinement in jail and prison. Guerrero has at least four prior convictions, which, notably, includes a conviction for arson in which he was found to have set fire inside of a county jail. During his confinement in prison, Guerrero repeatedly engaged in many acts of bad behavior. In fact, Guerrero's behavior became so egregious, he was transferred to another unit, where he was placed in administrative segregation. Yet, despite having his freedom severely restricted and his privileges taken away on a myriad of occasions, Guerrero

continued to demonstrate his inability to conduct himself "within the norms of society." *See Rummel*, 445 U.S. at 263.[5]

Kirk Brigance is a shift supervisor at the Telford Unit. Just moments after the incident occurred, Brigance saw Smith coming out of the hallway of the housing area. Brigance stated, "[Smith] was walking up towards me, and I could tell that she had been assaulted with fluids and stuff like that because you could see the brown kind of all over in her hair, dripping off of her."[6] According to Brigance, Smith was "kind of stumbling" because she could not see well. Brigance then escorted Smith to the medical unit. Brigance explained that, because Smith had been wearing her eye protection gear when the incident occurred, she looked like "an old coal miner, just this part was clear, you know, normal white skin. The rest of her was just brown and stuff where she had been assaulted with feces." Brigance described the odor as "overwhelming" and "pretty vile." He stated that Smith was "distraught" and "angry." Brigance said the foul substance "was in a very liquid form. It had obviously been sitting there for a while or stirred or whatever before he threw it on her. So she was covered from head to toe pretty much. It was a large amount."

After Guerrero's attack, Smith was sent to the medical unit, where a communicable infectious disease nurse drew her blood to determine if, as a result of the incident, her health had

---

[5]In *Rummel*, the United States Supreme Court held that it did not constitute "cruel and unusual punishment" to impose a life sentence under the Texas "recidivist statute" (currently Section 12.42(d) of the Texas Penal Code) against a defendant who had been convicted of fraudulent use of a credit card to obtain $80.00 worth of goods and services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses. *Rummel*, 445 U.S. at 263.

[6]Brigance explained that the correctional officers commonly refer to these types of incidents as "chunking" or "dashing."

been affected.[7]  Smith stated that the incident was extremely upsetting.  She took leave from her job for a month and even considered resigning.

During the punishment phase of the trial, the State presented evidence in support of its allegations that Guerrero had been previously convicted of arson,[8] family violence assault, and, twice, of burglary of a habitation.[9]  The court also heard about the TDCJ's administrative disciplinary process and Guerrero's extensive prison disciplinary history.[10]  As part of his egregious behavior, Guerrero used foul language, disobeyed orders, made verbal threats to harm or kill correctional officers, masturbated in the presence of the guards, and threw a substance at a laundry manager.[11]  After losing a variety of privileges as a result of the infractions, Guerrero was eventually placed in administrative segregation in another unit.[12]  Garth Parker, the warden at the Telford Unit, described administrative segregation as "about the worst you can be as an offender in a penitentiary, other than a death row offender."

---

[7]To ensure that Smith remained disease-free, she was required to submit to additional blood tests for the following year.

[8]While confined in the Victoria County Jail, Guerrero set fire to the inside and the outside of a cell.

[9]The State offered, and the trial court admitted, judgments and penitentiary packets in support of Guerrero's prior convictions.

[10]The prison disciplinary process includes the preparation of a written report containing the allegation against the inmate, an investigation of the alleged offense, a process of review, and a recommended punishment.

[11]The laundry manager described the substance as "some liquid, unknown substance."

[12]Administrative segregation, which is commonly thought of as "solitary confinement," is made up of offenders who have been stripped-searched and placed in mechanical hand restraints.  Individuals who are in administrative segregation must "rely on a security escort for anything."  Their recreation is much more limited, and they are not allowed to interact with other inmates.  They are required to eat their meals in their cells.  Unlike administrative segregation, general population is comprised of the "run-of-the-mill offender."  These types of offenders are allowed to leave their cells, interact with other offenders, and walk unescorted.

In *Shelton*, the Beaumont Division of the United States District Court for the Eastern District of Texas explained the inherent consequences of an inmate who participates in "chunking," stating,

> However, the contact in this case is not like the physical contact involved with a push or a punch. While a simple assault consisting of a push or a punch is unacceptable in society at large, let alone in a prison, the effects are immediate and usually not long lasting. . . .
> Throwing feces or urine on someone is more than mere "physical contact." Dysentery, hepatitis, HIV, and a host of other infectious diseases can be transferred by feces and urine. The victim in this type of assault is subject to worry and mental distress while awaiting the results of tests. In this case, the officer had to be treated with a "cocktail" of drugs to protect against such diseases.

*United States v. Shelton*, 431 F.Supp.2d 675, 676 (E.D. Tex. 2006). Here, Smith was required to submit to multiple blood tests over a period of months for the sole purpose of determining whether Guerrero's actions caused Smith to have any number of health issues. In addition to the pain and inconvenience of submitting to the blood tests, Smith was also subjected to emotional and mental distress each time she awaited her blood-test results. Guerrero did not simply assault Smith; he exposed her to the long-term possibility of contracting a debilitating or even fatal disease.

Guerrero's enhanced sentence was within the statutory range of punishment, and evidence included his prior criminal history as a repeat offender and his extensive prison disciplinary history. We have reviewed the record and find nothing to indicate that Guerrero's sentence was grossly disproportionate to his offense.[13] We therefore hold that Guerrero's life sentence is not in violation of constitutional standards.

---

[13]Because our comparison of Guerrero's crime does not give rise to an inference of gross disproportionality, it is not necessary to compare his sentences with the sentences of other offenders in the same jurisdiction or with the sentences imposed for the same crime in other jurisdictions.

We affirm the trial court's judgment.

                                    Josh R. Morriss, III
                                    Chief Justice

Date Submitted:      February 12, 2019
Date Decided:        February 20, 2019

Publish