**Dissenting opinion issued January 28, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NOS. 01-18-01016-CR, 01-18-01017-CR, 01-18-01018-CR

_____

### ROBERTO AMAYA PACAS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1561964, 1561965, 1561966**

---

### REVISED DISSENTING OPINION

Roberto Amaya Pacas pled guilty to three charges of felony assault.[1] The trial court accepted his pleas, found him guilty of all three charges, and sentenced him to 16 years' confinement for each charge, with the sentences to run concurrently.

---

[1] *See* TEX. PENAL CODE § 22.02(b).

On appeal, Pacas argues that his convictions should be vacated because the charges were not tried by a jury. Pacas grounds his argument in the text of Article I, section 10 of the Texas Constitution, which states, "In all criminal prosecutions, the accused *shall* have a speedy public trial by an impartial jury."[2] Pacas contends that the mandatory language of Article I, section 10 creates an absolute requirement that all prosecutions of felony offenses be tried by a jury and that the trial court therefore erred in accepting his pleas.[3]

In its opinion, the majority construes Article I, section 10 not as an absolute requirement that must be met in every case, but rather as a right that may be waived so long as certain conditions are met. I respectfully disagree.

As I have previously written, when construed according to its plain meaning and historical context, Article I, section 10 imposes an absolute requirement that

---

[2] TEX. CONST. art. I, § 10 (emphasis added).

[3] *See Proenza v. State*, 541 S.W.3d 786, 797 (Tex. Crim. App. 2017) ("When it comes to non-forfeitable rights, the legal responsibility of assuring compliance with these rights falls squarely upon the trial judge."); *see also Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014) (explaining that "absolute rights" are "widely considered so fundamental to the proper functioning of our adjudicatory process that they cannot be forfeited by inaction alone" (quotations and ellipses omitted)); *Marin v. State*, 851 S.W.2d 275, 280 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997) (explaining that "absolute requirements and prohibitions . . . are to be observed even without partisan request [and] can't lawfully be avoided even with partisan consent").

cannot be forfeited or waived.[4] It requires that all prosecutions for Old Code felonies be tried by a jury—even if the defendant affirmatively seeks to enter a plea of guilty or otherwise waive his right to a trial by jury.[5] I stand by my dissent in *Farris*, and its reasoning is dispositive here.[6]

I write separately today to make a few additional comments in the spirit of the late Justice Louis Brandeis, whose famous brief marked a turning point in how we think about and decide important constitutional issues through the use of economic and sociological data, historical experience, and expert opinion as extratextual support for legal propositions.[7] And in this case, such data makes clear that, in addition to being legally erroneous, the majority's construction of Article I, section 10 has contributed to and exacerbated one of the principal problems plaguing our

---

[4]  *Farris v. State*, 581 S.W.3d 920, 925, 929–30 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (Goodman, J., dissenting).

[5]  *Id.*

[6]  As the United States Supreme Court recently observed, "Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686, at \*3 (U.S. June 15, 2020). Article I, section 10 means exactly what it says: "In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury." TEX. CONST. art. I, § 10; *see also* TEX. GOV'T CODE § 311.016(2) ("'Shall' imposes a duty.").

[7]  *See, e.g.*, Martha Minow, *Foreword: Justice Engendered*, 101 HARV. L. REV. 10, 88–89 (1987) (describing Brandeis Brief as "mark[ing] a creative shift for the Court"); *see also Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 494 n.11 (citing famous "Doll Tests" as support for holding de jure racial segregation in public education is inherently unequal and thus unconstitutional).

criminal justice system—the proliferation of the plea bargain and the resultant scourge of mass incarceration.

## A.     The rise of the plea bargain

Our criminal justice system is no longer the system of trials that the Founders envisioned.[8] Instead, it is a system of plea bargaining, "negotiated behind closed doors and with no judicial oversight."[9] The story of how our criminal justice system evolved into a system of plea bargains is long and complex, but I will try to provide a brief summary.

Before the Civil War, plea bargains were exceedingly rare.[10] After the Civil War, things changed.[11] As waves of displaced Americans and immigrants moved to cities, crime rates rose, and the plea bargain became a convenient response to mounting caseloads: "by pleading guilty to lesser charges in return for dismissal of the more serious charges, defendants could reduce their prison time, while the prosecution could resolve the case without burdening the system with more trials."[12]

---

[8]     *See* Jed S. Rakoff, *Why Innocent People Plead Guilty*, THE NEW YORK REVIEW OF BOOKS, Nov. 20, 2014, available at https://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/ (hereinafter "Rakoff").

[9]     *Id.*

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

Courts were initially skeptical of plea bargains.[13] But they eventually came to approve of them "as an exercise in contractual negotiation between independent agents (the prosecutor and the defense counsel) that was helpful in making the system work."[14] Academics were likewise initially skeptical,[15] but they too eventually "came to approve of plea bargaining as a system somewhat akin to a regulatory regime."[16] Thus, by the early 1950s, over 80 percent of criminal cases were resolved by plea bargains.[17]

Another important development occurred in the 1960s, when the United States Supreme Court issued a series of opinions establishing more robust protections for

---

[13]     *Id.*

[14]     *Id.*

[15]     *Id.*

[16]     *Id.*

[17]     *Id.*

criminal defendants.[18] These rulings had the unintended effect of making trials lengthier and more burdensome, further incentivizing the use of plea bargains.[19]

Finally, in the 1960s, 70s, and 80s, rising crime rates, much of it drug related, provoked a get-tough response from law enforcement officers, prosecutors, and lawmakers.[20] State and federal legislatures significantly increased the penalties for criminal violations and passed mandatory minimum sentence and three strikes laws, "provid[ing] prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains."[21] And aggressive policing resulted in the arrest of millions of people annually, further expanding the criminal justice system, and further incentivizing the use of plea bargains.[22]

---

[18]  *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that Fifth Amendment right against self-incrimination requires law enforcement officials to advise suspects interrogated in custody of right to remain silent and right to attorney); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (holding that Sixth Amendment right to counsel is fundamental right that applies to States though Fourteenth Amendment's Due Process Clause).

[19]  Emily Yoffe, *Innocence Is Irrelevant*, THE ATLANTIC, Sept. 2017, available at https://www.theatlantic.com/magazine/archive/2017/09/innocence-is-irrelevant/534171/ (hereinafter "Yoffe").

[20]  *See* Rakoff; Yoffe.

[21]  Rakoff; *see also Rummel v. Estelle*, 445 U.S. 263, 285 (1980) (holding that life sentence imposed under Texas's three strikes law for conviction for felony fraud did not constitute cruel and unusual punishment).

[22]  *See* Yoffe.

The upshot is that today the overwhelming majority of criminal convictions are the result of plea bargains. The United States Supreme Court acknowledged this reality over eight years ago in *Missouri v. Frye*, which held that the constitutional right to effective assistance of counsel applies to plea bargaining, as such bargaining now constitutes a critical stage of the criminal process.[23] Writing for the majority, Justice Anthony Kennedy eloquently summarized the current situation:

> To a large extent horse trading between prosecutor and defense counsel determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system.[24]

When the Court issued *Frye* in 2012, 97 percent of federal convictions and 94 percent of state convictions were the result of guilty pleas.[25] Since then, not much has changed. Last year, for example, some 95 percent of criminal convictions in Texas district courts resulted from a guilty or no contest plea.[26]

---

[23]    566 U.S. 134, 155 (2012).

[24]    *Id.* (quoting Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992) (ellipses and brackets omitted)).

[25]    *Id.*

[26]    Annual Statistical Report for the Texas Judicial for Fiscal Year 2019 at 74, available at https://www.txcourts.gov/media/1445760/fy-19-annual-statistical-report.pdf. Corresponding data for federal courts is no different. *See, e.g.*, *Year One of Trump's DOJ: The National Criminal Sentencing Statistics*, THE NAT'L LAW REV. (June 4, 2019), https://www.natlawreview.com/article/year-one-trump-s-doj-national-criminal-sentencing-statistics ("Of the offenders sentenced in FY2018, 67,610 pleaded guilty to one or more offenses with which they were charged – a rate of 97.4%. This is the highest percentage of guilty pleas in federal cases since the

## B. The problems plea bargains cause

I readily acknowledge that our contemporary plea-bargaining systems has its advantages. In complicated cases involving organized crime, prosecutors can use plea bargains strategically, "extracting information from low-level offenders and pushing further up the criminal hierarchy."[27] Plea bargains often "provide genuinely good deals to people facing long prison sentences."[28] And, most fundamentally, plea bargains are economical.[29]

---

Commission began reporting data. The lowest guilty plea rate was in FY1991 (85.4%). The percentage of guilty pleas in federal cases has grown steadily since that time.").

[27] Dylan Walsh, *Why U.S. Criminal Courts Are So Dependent on Plea Bargaining*, THE ATLANTIC (May 2, 2017), https://www.theatlantic.com/politics/archive/2017/05/plea-bargaining-courts-prosecutors/524112/ (hereinafter "Walsh").

[28] Walsh; *see Frye*, 566 U.S. at 144 (noting the "potential . . . for defendants to admit their crimes and receive more favorable terms at sentencing" as among benefits of plea bargains); *Brady v. United States*, 397 U.S. 742, 751–52 (1970) (noting that "both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law").

[29] *Frye*, 566 U.S. at 144 (noting the "potential to conserve valuable prosecutorial resources" as among benefits of plea bargains); Walsh ("Trials are expensive and protracted. Two rational parties, goes the logic, can more cheaply and quickly come to an agreeable outcome through stripped-down bartering: The prosecutor offers a lenient charge if the defendant foregoes trial and admits guilt."); Yoffe ("Ideally, plea bargains work like this: Defendants for whom there is clear evidence of guilt accept responsibility for their actions; in exchange, they get leniency. A time-consuming and costly trial is avoided, and everybody benefits.").

Nevertheless, a growing body of research shows that these benefits have been largely overstated and are outweighed by significant costs. Our plea-bargaining system values efficiency over justice;[30] undermines democratic values;[31] and invites abuse and arbitrary results through a lack of transparency and regulation.[32]

But most concerning of all, our system of plea bargains causes a not insignificant number of defendants to plead guilty to crimes they did not actually commit. This is largely because the "bargaining takes place within a coercive framework in which the parties have asymmetric information and act through imperfect agents."[33]

---

[30]   *See* John Rappaport, *Unbundling Criminal Trial Rights*, 82 U. CHI. L. REV. 181–99 (2015) (hereinafter "Rappaport"). Efficiency, as the late Chief Justice Warren Burger recognized, is not an end in itself and should not be prioritized over courts' fundamental responsibility of sorting the guilty from the innocent. *See Mayer v. City of Chicago*, 404 U.S. 189, 201 (1971) (Burger, C.J., concurring) ("An affluent society ought not be miserly in support of justice, for economy is not an objective of the system.").

[31]   *See* Rappaport; Rakoff.

[32]   Rakoff. By and large, plea bargains are the products "of largely secret negotiations behind closed doors in the prosecutor's office, and [are] subject to almost no review, either internally or by the courts." *Id.*; *see also* Walsh ("Judges are not regularly allowed to take part when a plea deal is made, and written records of a deal are almost never required."). Such a system "inevitably invites" abuse and arbitrary results. Rakoff.

[33]   Rappaport.

In a typical case, the defense lawyer meets her client when or shortly after the defendant is arrested, so "at the outset, she is at a considerable informational disadvantage to the prosecutor."[34] And if the defendant cannot make bail, as is often the case, the defense lawyer will have "only modest opportunities, within the limited visiting hours and other arduous restrictions imposed by most jails, to interview [the defendant] and find out his version of the facts."[35] The prosecutor, by contrast, will typically have a full police report, complete with witness interviews and other evidence, grand jury testimony, forensic test reports, and follow-up investigations.[36] The prosecutor's evidence "may be one-sided and inaccurate."[37] But it still gives him "a huge advantage" over the defense lawyer.[38] And it may make "the prosecutor confident, maybe overconfident, of the strength of his case."[39]

It is against this background that the defense lawyer, usually within a few days of the defendant's arrest, meets with the prosecutor, "who makes clear that, unless the case can be promptly resolved by a plea bargain, he intends to charge the

---

[34]     Rakoff.

[35]     *Id.*

[36]     *Id.*

[37]     *Id.*

[38]     *Id.*

[39]     *Id.*

defendant with the most severe offenses he can prove."[40] Under these circumstances, even if the defendant is innocent, he will often make the rational choice to plead guilty, reasoning that serving a short sentence for a crime he did not commit is better than the risk of serving a much longer sentence for a more serious crime he did not commit.

But how often does this actually happen? How often do innocent defendants plead guilty. It's hard to say for sure, but the available data indicates the number is appallingly high. For example, of the more than 300 people exonerated by The Innocence Project with DNA evidence, nearly 11 percent pled guilty.[41] According to The National Registry of Exonerations,[42] the total number is even higher at 15

---

[40] *Id.*; *see also* Yoffe ("To induce defendants to plead, prosecutors often threaten 'the trial penalty': They make it known that defendants will face more-serious charges and harsher sentences if they take their case to court and are convicted.").

[41] Innocence Project and Members of Innocence Network Launch Guilty Plea Campaign, The Innocence Project (Jan. 23, 2017), https://www.innocenceproject.org/guilty-plea-campaign-announcement/#:~:text=Innocence%20Project%20and%20Members%20of%20Innocence%20Network%20Launch%20Guilty%20Plea%20Campaign&text=Innocent%20people%20are%20pleading%20guilty%20to%20crimes%20they%20did%20not%20commit.&text=With%20the%20system%20stacked%20against,lengthy%20prison%20sentences%20at%20trial.

[42] The Registry "collects, analyzes and disseminates information about all known exonerations of innocent criminal defendants in the United States, from 1989 to the present." Our Mission, The National Registry of Exonerations, http://www.law.umich.edu/special/exoneration/Pages/mission.aspx (last visited July 13, 2020).

percent.[43] Whatever the precise figure, one thing is clear: Innocent people routinely plead guilty to crimes they did not commit.

## C. A potential solution

What can we do about our problematic plea-bargaining system? One solution is to have more trials. Because trials are better at distinguishing the guilty from the innocent, having more trials "would reduce the social costs of wrongful convictions and enhance the criminal law's deterrent effects."[44] More trials would also "strengthen the bargaining position of defendants, whose threats of going to trial [would] become more credible, nudging plea bargaining closer to the law's shadow."[45] Further, trials make the performance of the prosecutor and the defense "more visible—and thus more accountable."[46] Like an audit, trials "shine a light on investigatory behavior and the exercise of governmental power more generally."[47] If the prosecutor or police behave badly, their misconduct will more often than not

---

[43]    Guilty Pleas, The National Registry of Exonerations (July 13, 2020), http://www.law.umich.edu/special/exoneration/Pages/Guilty-Pleas.aspx    (last visited July 13, 2020).

[44]    Rappaport.

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

remain buried when the defendant takes a plea.[48] Finally, trials "promote democratic values like local control and help to cultivate an active and informed citizenry."[49]

While no panacea, a renewed emphasis on trials would help correct some of the injustices caused by the proliferation of plea bargains—and conducting mandatory trials for Old Code felonies is what our constitution *already* requires. As I stated in my dissent in *Farris*, Article I, section 10's "striking, mandatory requirement stems from the earliest constitution of the Republic of Texas" and "emphasizes the importance that Texans place on the mandate for and the right to jury trials."[50] And as I hope my current dissent makes clear, the problems caused by our failure to follow this constitutional mandate highlight both the wisdom of our forefathers and our solemn obligation to follow the principles enshrined in our state's founding document.

### Conclusion

Whether Article I, section 10 requires trials for Old Code felonies is not merely a matter of academic debate, but rather an issue of profound importance to

---

[48]    *See* Walsh; *see also* Rappaport.

[49]    Rappaport.

[50]    *Farris*, 581 S.W.3d at 930.

our criminal justice system—the resolution of which may determine whether our system is truly just. I respectfully dissent.[51]


Gordon Goodman
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.

Justice Goodman, dissenting.

Publish. TEX. R. APP. P. 47.4.

---

[51] Because I conclude the trial court's violation of our constitution's mandate that all criminal prosecutions be tried by a jury requires that the judgment of conviction be reversed and the case be remanded for a new trial, I would not reach Pacas's second issue, in which he contends he was assessed duplicative court costs across his three convictions.